# IN THE SUPREME COURT OF IOWA

No. 16–0362

Filed June 30, 2017

Amended September 18, 2017

**STATE OF IOWA,**

Appellee,

vs.

**CHRISTOPHER GEORGE STORM,**

Appellant.

---

Appeal from the Iowa District Court for Dallas County, Randy V. Hefner, Judge.

Defendant appeals his conviction claiming automobile exception to search warrant requirement should be abandoned. **DISTRICT COURT JUDGMENT AFFIRMED.**

Daniel J. Rothman of McEnroe, Gotsdiner, Brewer, Steinbach & Rothman, P.C., for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik and Louis S. Sloven, Assistant Attorneys General, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide whether to abandon the automobile exception to the search warrant requirement under article I, section 8 of the Iowa Constitution. In *State v. Gaskins*, we did not reach that issue, but members of this court noted the rationale for the exception may be eroded by technological advances enabling police to obtain warrants from the scene of a traffic stop. 866 N.W.2d 1, 17 (Iowa 2015) (Cady, C.J., concurring specially). The defendant driver in today's case was lawfully stopped for a seat belt violation. The deputy smelled marijuana and searched the vehicle, discovering marijuana packaged for resale. The defendant was charged with possession with intent to deliver in violation of Iowa Code section 124.401(1)(*d*) (2015). He filed a motion to suppress, claiming this warrantless search violated the Iowa Constitution because police can now obtain warrants electronically from the side of the road. The district court denied the motion after an evidentiary hearing that included testimony that it would have taken well over an hour to obtain a search warrant. The defendant was convicted, and we retained his appeal.

On our review, we conclude, based on the evidence in the record, that this deputy was unable to obtain a warrant electronically from the scene of the traffic stop, and the procedures in place at that time required a warrant application to be presented in person to a judicial officer. For the reasons further explained below, we elect to retain the automobile exception, consistent with our precedent, federal caselaw, and the overwhelming majority of other states. We are guided by the decisions of other states that abandoned the automobile exception only to reinstate it. Their experience shows the easy-to-apply automobile exception is preferable to the alternative—a less predictable, case-by-case

exigency determination resulting in prolonged roadside seizures awaiting a warrant, with attendant dangers and no net gain for civil liberties. We may revisit this issue at a future time when roadside electronic warrants have become more practical. Today, we affirm the district court's ruling denying the defendant's motion to suppress and defendant's conviction.

## I. Background Facts and Proceedings.

On the afternoon of April 19, 2015, sheriff's deputy Clay Leonard was on patrol in Dallas County at the intersection of Highway 141 and Wendover. He saw a male driving a dark-colored Chevrolet pickup truck without wearing a seat belt. The deputy activated his emergency lights to stop the driver. He reported to dispatch the location of the traffic stop, about a twenty-five-minute drive from the Dallas County courthouse. He walked to the driver's side window and asked for the lone occupant's license and registration. As they talked, he noticed that the driver, Christopher Storm, "appeared to be nervous, hands shaking and quick labored breaths." Deputy Leonard "could smell the distinct odor of marijuana coming from the vehicle." He brought Storm back to the front seat of his patrol car for questioning. Storm made a call on his cell phone, and two of his acquaintances arrived. Storm initially denied smoking marijuana or having any in his truck, but after further discussion, he admitted to using marijuana previously and having a criminal record. Over Storm's objection, Deputy Leonard searched the truck. He found several packages of marijuana, a scale, a grinder, a pipe, an e-cigarette with residue, and pills in an unmarked bottle. These items were removed, and Storm was placed under arrest. One of Storm's acquaintances drove his truck away after the arrest.

The marijuana found in Storm's truck totaled forty-seven grams. The fourteen pills in the unmarked bottle were amphetamine/

dextroamphetamine, with no prescription. Storm's cell phone had text messages showing he had been selling marijuana. The State charged Storm by trial information with possession with intent to deliver marijuana in violation of Iowa Code section 124.401(1)(*d*); tax stamp violations under sections 453B.1, 453B.3, 453B.4, and 453B.12; and unlawful possession of a prescription drug in violation of section 155A.21.

Storm filed a motion to suppress. He argued that a warrantless search of a vehicle based solely upon probable cause no longer comports with article I, section 8 of the Iowa Constitution because new technology enables officers to file warrant applications at the scene of the traffic stop. The State resisted, and the district court conducted an evidentiary hearing.

Deputy Leonard and Lieutenant Adam Infante testified for the State. Deputy Leonard testified that it is a "routine occurrence" that he is the only law enforcement officer "dealing with multiple individuals or suspects." If he has to call for assistance, it could be thirty to forty minutes before another officer arrives. When he stopped Storm, Deputy Leonard had a personal cell phone, a department-issued flip phone, and an in-car computer. His internet connection was "slow" at that location. He lacked the equipment to remotely obtain a warrant.

Deputy Leonard also testified about the time needed to write a search warrant application:

> Q. How long, in your experience, has it taken you to author search warrants? A. By the time I get back to the police department or my office . . . to type it up, make phone calls, get ahold of a county attorney to look over it, review it—I also have to get assistance because I'm not, I don't do it all the time, so I either have a detective or somebody else that writes them up assist me.

And then, after making phone calls, getting ahold of them, sending the document back and forth maybe to fix, grammatically fix a couple things or something, then the judge signs it.

Most of the time I have to go to the judge's house if it's after hours. It's 5, 6 hours by the time I get everything done and be able to execute the warrant.

He noted how having to write a warrant in the patrol car would change this process:

Well, typing up documents, trying to put everything into the document that's required by law, and trying to watch somebody or what's going on at the scene, or timewise, et cetera, is—I mean, it takes away from me being able to keep observation around me, keep me safe, et cetera.

Lieutenant Infante, who estimated he had written "hundreds" of warrants, testified it would take him, in a "[b]are-bones case," "about an hour." He outlined the complexity of the warrant process:

First thing you need to do in the search warrant is identify with specificity the item or property to be searched. In this case a vehicle make, model, VIN, license plate, color, location of the vehicle, that sort of thing.

Next step would be to determine the items that you're looking for in said vehicle. Which, once again, has to be fairly specific.

After that I would lay out my affidavit for why I believe there's probable cause to search the vehicle for the items that I'm looking for.

The next step would be to add an attachment B if there was any sort of outside information that I might have received from another law enforcement officer or informant of some sort.

In Dallas County the judges prefer that we assist them with filling out the endorsement, where in some other counties that's not the case. Then I would contact the county attorney to get their approval of the search warrant, to discuss any details or items that I might have left out. And then after I have had the county attorney's approval I would then begin the arduous task of tracking down a judge.

He testified tracking down a judge can be difficult, whether it is "3 or 4 o'clock in the morning" or "3 o'clock in the afternoon" because they are

often involved in other business such as hearings, appearances, or conferences.

Lieutenant Infante acknowledged he takes a "cautious" approach to search warrants, explaining the importance of accuracy:

> I've lost a search warrant in this very courtroom before for not being correct. You only have one opportunity to write a search warrant and get it signed by a judge. Once it's signed, sealed, that's it. You don't get an opportunity to go back and edit it or make corrections or change anything.

If he had to apply for a search warrant from his squad car, "It would be hard for [him to] do a good job. It would be hard for [him] to be accurate with having to pay attention to [the driver] and also keep an eye on the property to be searched." He noted the challenge of multitasking while using the in-car computer:

> There's a misconception that these in-car computers are, you know you're going to sit there and you're going to write all your reports on this in-car computer. That's not the case. These computers issue citations, warnings; they do some accidents. A scanner is involved in that. The entering on the computer is minimal.
>
> We're not typing an affidavit on our in-car computer. We're going back to the office where we can sit down, face a computer, do it correctly.
>
> These deputies are turned sideways; they're [not looking] out the side of the window to make sure nobody hits them; they're watching the guy in the back seat. The in-car computer is not what people think it is.

Lieutenant Infante also testified there was no process for submitting warrants electronically to judges in Dallas County.

Storm presented testimony from Bryan Barker, a criminal defense attorney and former police officer and prosecutor, who estimated he could fill out a warrant application in fifteen minutes. However, Barker qualified his testimony by stating he would be making extensive use of "boilerplate." He noted it likely would take another "15 to . . . 30

minutes" to get approval from a judge, assuming the warrant could be sent electronically and the judge was available, for a total of thirty to forty-five minutes.

The district court denied Storm's motion to suppress, concluding that Iowa statutes and rules "expressly anticipate that [a] warrant application will be signed under oath in the actual physical presence of the judge or magistrate." The district court applied the automobile exception, stating, "Under these circumstances, mobility of the vehicle was more than a theoretical or presumed problem," and "[a] very real possibility existed that the vehicle would be driven away from this location before a warrant could be obtained by any means." The district court made a factual finding that "Deputy Leonard did not have available to him at the time and place of this search the technology or training that would have allowed submission" of an electronic warrant.

Storm was convicted of possession with intent to deliver at a bench trial on the minutes of testimony. He was given a suspended prison sentence of no more than five years and placed on two years of probation. He appealed, and we retained the appeal.

## II. Standard of Review.

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017). We look to the entire record and "make 'an independent evaluation of the totality of the circumstances.'" *Id.* (quoting *In re Prop. Seized from Pardee*, 872 N.W.2d 384, 390 (Iowa 2015)). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of the witnesses, but we are not bound by those findings." *Id.* (quoting *Pardee*, 872 N.W.2d at 390).

### III.  Analysis.

Storm asks us to abandon the automobile exception, contending its rationale has been eroded by new technology allowing warrants to be obtained promptly from the scene of the traffic stop.  On our de novo review, we find the evidentiary record belies Storm's factual premise.  Like the district court, we find that Deputy Leonard lacked the capability to obtain a search warrant from the scene of the traffic stop and that it would have taken over an hour to get a warrant to search Storm's truck.  Based on this evidentiary record and our survey of precedent nationwide, we retain the automobile exception and affirm the district court.

**A.  The Automobile Exception's History and Rationales**.  "The Supreme Court has recognized a 'specifically established and well-delineated' exception to the warrant requirement for searches of automobiles and their contents."  *State v. Allensworth*, 748 N.W.2d 789, 792 (Iowa 2008) (quoting *California v. Acevedo*, 500 U.S. 565, 580, 111 S. Ct. 1982, 1991 (1991)).  "[T]his exception is applicable when probable cause and exigent circumstances exist at the time the car is stopped by police."  *State v. Holderness*, 301 N.W.2d 733, 736 (Iowa 1981).  The inherent mobility of motor vehicles satisfies the exigent-circumstances requirement.  *Id.* at 737.

The automobile exception rests on twin rationales: (1) the inherent mobility of the vehicle, and (2) the lower expectation of privacy in vehicles compared to homes and other structures.  *Allensworth*, 748 N.W.2d at 793–94.  There was no procedure in place in Dallas County in 2015 for Deputy Leonard to obtain a search warrant electronically from the scene of his traffic stop.[1]  We decline to replace the easy-to-apply automobile

---

[1]The State contends that Iowa law in 2015 required in-person presentations of warrant applications to judicial officers.  We need not decide that question of statutory

exception with a case-by-case exigency determination that results in less predictable, inconsistent outcomes and prolonged seizures with roadside hazards and no net gain in liberty. Vehicles remain inherently mobile with reduced expectations of privacy, while rapid roadside warrants are not yet a realistic option. We conclude the twin rationales for the automobile exception remain valid.

1. *The inherent mobility of the automobile.* The United States Supreme Court first recognized the automobile exception to the search-warrant requirement in *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280 (1925). The *Carroll* Court addressed when police could search the vehicles of bootleggers suspected of transporting liquor during the Prohibition. *Id.* at 160, 45 S. Ct. at 287–88. After surveying federal law since the adoption of the Fourth Amendment, the Supreme Court observed,

> [T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between the search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Id.* at 153, 45 S. Ct. at 285. Given the inherent mobility of the automobile and the impracticability of securing a warrant, the *Carroll* Court held a warrantless search would be lawful if the officer had "reasonable or probable cause for believing that the automobile which he stops and seizes has contraband." *Id.* at 156, 45 S. Ct. at 286.

---

interpretation because under the automobile exception, no warrant was required and the legislature this year prospectively authorized remote electronic warrants. S.F. 358, 87th G.A., 1st Sess. § 4 (Iowa 2017).

Forty-five years later in *Chambers v. Maroney*, the Supreme Court reaffirmed the automobile exception for a vehicle impounded and searched at the police station following the driver's arrest. 399 U.S. 42, 48, 90 S. Ct. 1975, 1979 (1970). The Court reiterated its mobility rationale, stating,

> [A] search warrant [is] unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.

*Id.* at 51, 90 S. Ct. at 1981. The *Chambers* Court confronted the same argument Storm raises today: that a vehicle should simply be seized until a magistrate authorizes a warrant. *Id.* The Court observed,

> Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which the "lesser" intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Id.* at 51–52, 90 S. Ct. at 1981. Concluding the warrantless search was constitutional, the Court emphasized that "there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." *Id.* at 52, 90 S. Ct. at 1981.

The Supreme Court more recently reaffirmed that exigent circumstances apart from the mobility of the vehicle are not required to justify a warrantless search. In *Maryland v. Dyson*, police received a tip

from a reliable confidential informant that a drug dealer would be returning to Maryland in a specifically identified red rental car. 527 U.S. 465, 465, 119 S. Ct. 2013, 2013 (1999) (per curiam). Officers stopped and searched the vehicle, finding twenty-three grams of crack cocaine. *Id.* at 466, 119 S. Ct. at 2013. The Maryland Court of Special Appeals reversed the district court's denial of the defendant's motion to suppress, finding that although there was probable cause to conduct the search, there "was no exigency that prevented or even made it significantly difficult for the police to obtain a search warrant." *Id.* The Supreme Court reversed, noting that "under our established precedent, the 'automobile exception' has no separate exigency requirement." *Id.* at 466, 119 S. Ct. at 2014; *see also Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S. Ct. 2485, 2487 (1996) (per curiam) (using the automobile exception to justify a search based only on probable cause with no additional exigency).

2. *The lower expectation of privacy in automobiles.* The United States Supreme Court has also justified the automobile exception based on the reduced expectation of privacy resulting from the "configuration, use and regulation of automobiles." *Arkansas v. Sanders,* 442 U.S. 753, 761, 99 S. Ct. 2586, 2591 (1979), *abrogated on other grounds by Acevedo,* 500 U.S. at 575, 111 S. Ct. at 1989. Indeed, "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects." *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S. Ct. 2464, 2469 (1974). Unlike a home or office, "[a] car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view." *Id.* Furthermore,

> [b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office.

*Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973).

As the Supreme Court explained,

> In discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly noncriminal in nature. Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.

*South Dakota v. Opperman*, 428 U.S. 364, 367–68, 96 S. Ct. 3092, 3096 (1976) (citation omitted). "In the interests of public safety . . . automobiles are frequently taken into police custody." *Id.* at 368, 96 S. Ct. at 3097 (citation omitted). Police may impound vehicles after accidents to permit "the uninterrupted flow of traffic." *Id.* Not so with a home or other structure.

The state's interest in highway safety allows warrantless checkpoint stops without individualized reasonable suspicion. *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 455, 110 S. Ct. 2481, 2488 (1990). By contrast, the interest in safe neighborhoods cannot justify warrantless searches of homes or businesses on a city block. Rather, a search warrant is required to "effect an unconsented administrative entry into and inspection of private dwellings or commercial premises." *Opperman*, 428 U.S. at 367 n.2, 96 S. Ct. at 3096 n.2 (citing *Camara v. Mun. Ct.*, 387 U.S. 523, 87 S. Ct. 1727 (1967)).

**B. Iowa's Adoption of the Automobile Exception Under Our State Constitution.** The search and seizure provisions of the Fourth Amendment to the United States Constitution[2] and article I, section 8 of the Iowa Constitution[3] are virtually identical. "We may construe the Iowa Constitution differently than its federal counterpart, despite the provisions containing nearly identical language and being structured generally with the same scope, import, and purpose." *State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013). We adopted the automobile exception under article I, section 8 of the Iowa Constitution in *State v. Olsen*, 293 N.W.2d 216, 220 (Iowa 1980). Previously, we had required exigency separate from the mobility of the vehicle to justify a warrantless search, but we clarified that we did so because "[a]t that time some doubt existed as to the scope of *Chambers*." *Id.* at 219; *see also State v. Schlenker*, 234 N.W.2d 142, 145 (Iowa 1975) (requiring separate showing of exigency). Federal cases subsequently clarified that "[t]he exigency requirement . . . is sufficiently established by the inherent mobility of the vehicle, the fact defendant was alerted, and the chance that the car's contents might not be found again if a warrant had to be then obtained." *Olsen*, 293 N.W.2d

---

[2]The Fourth Amendment to the Federal Constitution provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[3]Article I, section 8 of the Iowa Constitution provides,

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8.

at 220. While acknowledging we were "still free to apply" our previous holdings under an independent approach to the Iowa Constitution, we were "persuaded that the state constitution should be given the same interpretation as the Federal." *Id.* at 219, 220.

We have continued to follow the federal automobile exception for decades. *See, e.g.*, *Allensworth*, 748 N.W.2d at 791 n.2 (rejecting an Iowa constitutional challenge to a warrantless vehicle search); *State v. Maddox*, 670 N.W.2d 168, 171 (Iowa 2003) (applying the automobile exception to uphold a warrantless search under the Federal and Iowa Constitutions because of a vehicle's "inherent mobility"); *Holderness*, 301 N.W.2d at 737 (rejecting federal and state constitutional challenges to a warrantless vehicle search conducted at the police station); *see also State v. Vance*, 790 N.W.2d 775, 791 (Iowa 2010) (Cady, J., dissenting) ("This [automobile] exception has been firmly planted in our Iowa jurisprudence for over twenty years."). We are not persuaded to chart a different course today. "Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law." *Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015). Storm offers no compelling reason for overruling our precedent on the automobile exception.

**C. The Overwhelming Majority of State Courts Have Retained the Automobile Exception.**

1. *All but five states have retained the automobile exception.* An overwhelming majority of states continue to adhere to the automobile exception.[4] These include courts that have construed their state

---

[4]*See State v. Reyna*, 71 P.3d 366, 369 n.5 (Ariz. Ct. App. 2003); *Jackson v. State*, 427 S.W.3d 607, 613 (Ark. 2013); *People v. Zuniga*, 372 P.3d 1052, 1056 (Colo. 2016); *People v. Edwards*, 836 P.2d 468, 471 (Colo. 1992); *State v. Williams*, 88 A.3d 534, 547 (Conn. 2014); *Reeder v. State*, Nos. 552,1999, 583,1999, 2001 WL 355732, at *2 (Del.

constitutions to allow greater protection than the Fourth Amendment. *See Commonwealth v. Gary*, 91 A.3d 102, 126 (Pa. 2014) ("[A] generally enhanced concern for individual privacy" does not "translate[] into a conferral of increased privacy protection in every context in which it is asserted under [the state constitution.]"); *see also Stout v. State*, 898 S.W.2d 457, 460 (Ark. 1995) ("Of course, we could hold that the Arkansas Constitution provides greater protection against unreasonable searches than does the Constitution of the United States, but we see no reason to do so."); *People v. Smith*, 447 N.E.2d 809, 813 (Ill. 1983) (noting "the Supreme Court's interpretation of the automobile exception . . . achieves a fair balance"); *Commonwealth v. Motta*, 676 N.E.2d 795, 800 (Mass. 1997) ("Indeed, while it is true that we have at times concluded that art. 14 provides more protection than the Fourth Amendment, we have also followed the Supreme Court in the area of the automobile exception."); *State v. Lloyd*, 312 P.3d 467, 474 (Nev. 2013) ("Although it is elementary that states may provide greater protections than required by the federal Constitution, it is at least as fundamental that such decisions

---

Mar. 26, 2001); *State v. Betz*, 815 So. 2d 627, 631 (Fla. 2002); *State v. Wallace*, 910 P.2d 965, 714 n.16 (Haw. 1996); *State v. Anderson*, 302 P.3d 328, 331 (Idaho 2012); *People v. Smith*, 447 N.E.2d 809, 813 (Ill. 1983); *State v. Conn*, 99 P.3d 1108, 1111–12 (Kan. 2004); *Chavies v. Commonwealth*, 354 S.W.3d 103, 107 (Ky. 2011); *State v. Crawford*, 210 So. 3d 268, 269 (La. 2017); *State v. Melvin*, 955 A.2d 245, 250 (Me. 2008); *State v. Ireland*, 706 A.2d 597, 599 n.2 (Me. 1998); *Berry v. State*, 843 A.2d 93, 113 (Md. Ct. Spec. App. 2004); *Commonwealth v. Dame*, 45 N.E.3d 69, 81 (Mass. 2016); *People v. Kazmierczak*, 605 N.W.2d 667, 674 (Mich. 2000); *State v. Lester*, 874 N.W.2d 768, 771 (Minn. 2016); *Moore v. State*, 787 So. 2d 1282, 1288 (Miss. 2001); *State v. Rocha*, 890 N.W.2d 178, 202 (Neb. 2017); *State v. Lloyd*, 312 P.3d 467, 474 (Nev. 2013); *State v. Witt*, 126 A.3d 850, 853 (N.J. 2015); *People v. Galak*, 616 N.E.2d 842, 843–44 (N.Y. 1993); *State v. Isleib*, 356 S.E.2d 573, 577 (N.C. 1987); *State v. Zwicke*, 767 N.W.2d 869, 873 (N.D. 2009); *Gomez v. State*, 168 P.3d 1139, 1145 (Okla. 2007); *State v. Andersen*, 390 P.3d 992, 995 (Or. 2017); *Commonwealth v. Gary*, 91 A.3d 102, 136–37 (Pa. 2014); *State v. Werner*, 615 A.2d 1010, 1014 (R.I. 1992); *State v. Fischer*, 873 N.W.2d 681, 689 (S.D. 2016); *State v. Sweedland*, 721 N.W.2d 409, 413–14 (S.D. 2006); *State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009); *State v. Rigby*, 369 P.3d 127, 137–38 (Utah Ct. App. 2016); *State v. Tompkins*, 423 N.W.2d 823, 829 (Wis. 1988); *McKenney v. State*, 165 P.3d 96, 99 n.1 (Wyo. 2007).

should be carefully reasoned and grounded in a strong public policy." (quoting Thomas B. McAffee et al., *The Automobile Exception in Nevada: A Critique of the* Harnisch *Cases,* 8 Nev. L.J. 622, 648 (2008) [hereinafter McAffee])). We should not simply "reflexively find 'in favor of any new right or interpretation asserted' under [the state search and seizure provision]." *Gary,* 91 A.3d at 126 (quoting *Commonwealth v. Russo,* 934 A.2d 1199, 1210 (Pa. 2007)).

In *State v. Rocha,* the Nebraska Supreme Court this year addressed the continuing validity of the automobile exception under its state constitution. 890 N.W.2d 178, 207 (Neb. 2017). Police found marijuana on Eric Rocha after he consented to a pat-down search during a roadway stop. *Id.* at 188. The officer arrested Rocha and searched his vehicle, finding methamphetamine, marijuana, two glass vials, a glass pipe, and two digital scales near the center console. *Id.* Rocha moved to suppress the evidence discovered during the warrantless search of the automobile. *Id.* at 190. Rocha argued additional exigent circumstances, beyond the vehicle's inherent mobility, were required for a warrantless search. *Id.* at 204. He asserted that when a defendant was incapable of physically moving the vehicle or destroying evidence, officers must obtain a warrant. *Id.* at 205. The Nebraska Supreme Court disagreed. *Id.* The *Rocha* court, after surveying federal and state decisions, concluded,

> In light of the overwhelming weight of authorities, we hold that the requirement of ready mobility for the automobile exception is met whenever a vehicle that is not located on private property is capable or apparently capable of being driven on the roads or highways. This inquiry does not focus on the likelihood of the vehicle's being moved under the particular circumstances and is generally satisfied by the inherent mobility of all operational vehicles. It does not depend on whether the defendant has access to the vehicle at the time of the search or is in custody, nor on whether the vehicle has been impounded. The purpose of the ready mobility requirement is to distinguish vehicles on

> public property from fixed, permanent structures, in which there is a greater expectation of privacy.

*Id.* at 207. We reach the same conclusion.

2. *Five other states that had abandoned the automobile exception changed course and restored it.* We can learn from the experiences of the five states previously requiring a separate showing of exigent circumstances that restored the automobile exception. *See Lloyd*, 312 P.3d at 474; *State v. Witt*, 126 A.3d 850, 853 (N.J. 2015); *State v. Zwicke*, 767 N.W.2d 869, 873 (N.D. 2009); *Gomez v. State*, 168 P.3d 1139, 1145 (Okla. Crim. App. 2007); *State v. Werner*, 615 A.2d 1010, 1014 (R.I. 1992). The Nevada Supreme Court reversed course after recognizing that its separate exigency requirement had produced "confusion, while doing little to enhance the protection of individual privacy interests." *Lloyd*, 312 P.3d at 473 (quoting McAffee, 8 Nev. L.J. at 624). By contrast, the automobile exception was "rooted in good policy that balances private interests with the collective good, even as it provides law enforcement with clear and unequivocal guidelines for doing their jobs." *Id.* at 474 (quoting McAffee, 8 Nev. L.J. at 648).

Similarly, North Dakota, Oklahoma, and Rhode Island returned to the federal standard to restore clarity in the law. *Zwicke*, 767 N.W.2d at 873 ("[S]ince this Court decided *Meadows*, the United States Supreme Court has held that . . . there need not exist exigent circumstances . . . . [T]o the extent that *Meadows* can be read to require something more than mobility for exigent circumstances, we overrule that part of our decision in that case."); *Gomez*, 168 P.3d at 1145 ("Because we believe the United States Supreme Court's decisions . . . rest on sound principles, we are persuaded they should inform our construction of Article 2, § 30 . . . . To the extent that [earlier cases] hold to the

contrary, they are overruled."); *Werner*, 615 A.2d at 1014 ("In light of the Supreme Court's clarification of the exigency issue, we conclude that it is preferable to adopt one clear-cut rule to govern automobile searches and, in turn, eliminate the conflicting interpretations of article I, section 6, of the Rhode Island Constitution and the Fourth Amendment to the United States Constitution.").

The New Jersey Supreme Court recently overruled its prior decisions that applied a "pure exigent-circumstances requirement to justify an automobile search." *Witt*, 126 A.3d at 853 (citing *State v. Cooke*, 751 A.2d 92, 97 (2000), *abrogated by Witt*, 126 A.3d at 853). The court had used a multifactor approach. *Id.* at 864 (listing exigent circumstances as "the time of day; the location of the stop; the nature of the neighborhood; the unfolding of the events establishing probable cause; the ratio of officers to suspects; the existence of confederates who know the location of the car and could remove it or its contents; whether the arrest was observed by passersby who could tamper with the car or its contents; whether it would be safe to leave the car unguarded and, if not, whether the delay that would be caused by obtaining a warrant would place the officers or the evidence at risk" (quoting *State v. Pena-Flores*, 965 A.2d 114, 128 (N.J. 2009), *abrogated by Witt*, 126 A.3d at 853)). The New Jersey Supreme Court had concluded that telephonic warrants would provide an "efficient and speedy" procedure "that will be available to [officers] on the scene; that will obviate the need for difficult exigency assessments; and that will guarantee our citizens the protections that the warrant requirement affords." *Id.* (quoting *Pena-Flores*, 965 A.2d at 132). Experience proved otherwise:

> Experience and common sense persuade us that the exigent-circumstances test in *Pena-Flores* does not provide greater liberty or security to New Jersey's citizens and has

placed on law enforcement unrealistic and impracticable burdens. First, the multi-factor exigency formula is too complex and difficult for a reasonable police officer to apply to fast-moving and evolving events that require prompt action. Thus, we cannot expect predictable and uniform police or judicial decision-making. Second, the securing of telephonic warrants results in unacceptably prolonged roadway stops. During the warrant-application process, the occupants of a vehicle and police officers are stranded on the side of busy highways for an extended period, increasing the risk of serious injury and even death by passing traffic. If the car is impounded, then the occupants' detention will be extended for an even longer period as a warrant is procured.

*Id.* at 853.

Specifically, the New Jersey court noted in 2015 that the average time to issue a telephonic warrant was fifty-nine minutes. *Id.* at 869. Some troopers experienced delays of two hours.[5] *Id.* The *Witt* court recognized, "The hope that technology would reduce the perils of roadside stops has not been realized." *Id.* Prolonged encounters along the shoulder of the highway posed "unacceptable risk of serious bodily injury and death." *Id.* "News reports reveal the carnage caused by cars and trucks crashing into police officers and motorists positioned on the

---

[5]Other courts have noted the complexity of obtaining remote warrants. We have observed that "[o]btaining a warrant by telephone is fairly complicated" and "requires considerable time." *State v. Johnson*, 744 N.W.2d 340, 345 (Iowa 2008) (describing the telephonic warrant application process). Other states have had similar experiences, finding the "average time for obtaining a telephone warrant" was about two hours. *State v. Raymond*, 360 P.3d 734, 737 (Or. Ct. App. 2015); *see also United States v. Orozco*, No. 98-CR-934, 1990 WL 118287, at *3 (E.D.N.Y. 1990) (noting police testimony that a telephonic warrant "definitely" could not be obtained in less than one and a half hours); *State v. Sanchez-Loredo*, 272 P.3d 34, 36 (Kan. 2012) ("Reno County law enforcement officers made a traffic stop of Dinah Sanchez–Loredo's vehicle [and] detained her at the scene for approximately 75 minutes while obtaining a search warrant."); David A. Sklansky, *Quasi-Affirmative Rights in Constitutional Criminal Procedure*, 88 Va. L. Rev. 1229, 1250–51 (2002) (noting that under federal law, "[a]n officer's decision to seek a telephonic warrant rather than to proceed without a warrant . . . can mean a significant delay"). We are not persuaded by *United States v. Baker*, 520 F. Supp. 1080, 1084 (S.D. Iowa 1981). In *Baker*, the court found that police could procure an *arrest* warrant, not a search warrant, in twenty minutes. *Id.* This was without the defendant present, so officers were able to focus their full attention on the warrant application and prepare it at a desk, not at a roadside stop. *Id.*

shoulders of our highways." *Id.* We decline to impose those risks on Iowa motorists and peace officers.

The New Jersey Supreme Court noted another downside to requiring warrants for roadside searches of automobiles—the pressure put on motorists to consent to the search to avoid the delay:

> [O]ne of the unintended consequences of *Pena-Flores* is the exponential increase in police-induced consent automobile searches. The resort to consent searches suggests that law enforcement does not consider time-consuming telephonic warrants or the amorphous exigent-circumstances standard to be a feasible answer to roadway automobile searches. The heavy reliance on consent searches is of great concern given the historical abuses associated with such searches and the potential for future abuses.

*Id.* at 853. New Jersey studies revealed that after implementing the exigent-circumstances approach, "nearly ninety-five percent of detained motorists granted a law enforcement officer's request for consent to search." *Id.* at 870 (quoting *State v. Carty*, 790 A.2d 903, 911 (N.J. 2002)). The *Witt* court recognized the "coercive effect of a search request made to a motorist stopped on the side of a road." *Id.*; *see also State v. Pals*, 805 N.W.2d 767, 783 (Iowa 2011) (considering that the driver was "seized in the front seat of a squad car with his own vehicle parked on the side of a public highway" as part of the coercion analysis).

Finally, the *Witt* court elaborated on the "difficulty presented to police officers" by the multifactor, exigent-circumstances approach. 126 A.3d at 871.

> Under that standard, before conducting a warrantless roadside search, police officers must take into account a dizzying number of factors. These factors leave open such questions as "what is the acceptable ratio of officers to suspects, what should the officer know about the neighborhood, how is he to know if confederates are skulking about, and what does it mean to consider leaving the car unguarded when the car can be safely towed and impounded?"

*Id.* (citation omitted) (quoting *Pena-Flores*, 965 A.2d at 139 (Albin, J., dissenting)).  Overall, the court concluded that the multifactor approach "places significant burdens on law enforcement," but "[o]n the other side of the ledger, [the court] did not perceive any real benefit to our citizenry by the warrant requirement in such cases." *Id.* at 872.  The *Witt* court therefore decided to reinstate the automobile exception under the New Jersey Constitution.  *Id.*  We likewise retain the automobile exception to avoid the litany of problems experienced in New Jersey under its prior multifactor exigent-circumstances test.

3. *The state court decisions cited by Storm are unpersuasive.*  Storm relies on the decisions of five state courts that do not recognize the automobile exception.[6]  *See State v. Elison*, 14 P.3d 456, 471 (Mont. 2000); *State v. Sterndale*, 656 A.2d 409, 411 (N.H. 1995); *State v. Gomez*, 932 P.2d 1, 12 (N.M. 1997); *State v. Bauder*, 924 A.2d 38, 50 (Vt. 2007); *State v. Tibbles*, 236 P.3d 885, 888 (Wash. 2010).  These decisions are unpersuasive and distinguishable.

For example, Montana's constitution contains an express right to privacy, separate from its search and seizure provision, that provides "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."  Mont. Const. art. II, § 10.  Based on this "unique constitutional language," the Montana Supreme Court determined the

---

[6]Connecticut and Oregon follow a modified version of the automobile exception, which provides that the automobile's mobility justifies a search of a vehicle stopped on the side of the road, but not a vehicle that has already been impounded or parked.  *See State v. Winfrey*, 24 A.3d 1218, 1224 (Conn. 2011); *Andersen*, 390 P.3d at 998.  Because this was a roadside stop, these states would permit the automobile exception as justification for the warrantless search.  Two other states, Hawaii and Utah, while disallowing searches of *closed containers* within the automobile, follow the automobile exception for the vehicle itself.  *See Wallace*, 910 P.2d at 714 n.16; *Rigby*, 369 P.3d at 138.

state constitution "affords citizens a greater right to privacy, and, therefore, provides broader protection than the Fourth Amendment in cases involving searches of private property." *Elison*, 14 P.3d at 468–69. Washington's constitution also contains an express right to privacy. *See* Wash. Const. art. I, § 7 (containing privacy provision stating "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law"). The Washington Supreme Court relied on that privacy provision to require exigency. *Tibbles*, 236 P.3d at 889. The Iowa Constitution lacks a separate privacy provision. So does the Constitution of Pennsylvania, and that state's supreme court declined to follow the Washington precedent for that reason. *See Gary*, 91 A.3d at 132.

The search and seizure provisions of the New Hampshire and Vermont Constitutions also differ textually from the Fourth Amendment. *See* N.H. Const. pt. 1, art. XIX (containing additional language, "all warrants to search suspected places . . . are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order, in a warrant to a civil officer, to make search in suspected places, . . . be not accompanied with a special designation of the persons or objects or search"); *State v. Savva*, 616 A.2d 774, 779 (Vt. 1991) (noting additional language in search and seizure provision that warrants issued "without oath or affirmation first made, affording sufficient foundation for them" and without property "particularly described" are "contrary to [the right to be free from search or seizure], and ought not be granted" (quoting Vt. Const. ch. I, art. XI)). By contrast, there is no such textual difference between the search and seizure provisions of the Fourth Amendment and article I, section 8 of the Iowa Constitution. We will follow our own precedent.

**D. New Technology Has Not Undermined the Validity of the Automobile Exception.**

1. *The automobile exception retains its validity under federal law notwithstanding decades of experience with electronic court filings.* Adherence to the automobile exception has not waned in the face of developing technology. Storm points to our statewide use of electronic court filings through the electronic data management system (EDMS). But federal courts have used electronic filing for decades and continue to apply the automobile exception to uphold warrantless searches of vehicles. *See United States v. DeLeon,* \_\_\_ F. App'x \_\_\_, \_\_\_, 2017 WL 1828095, at *1 (5th Cir. May 4, 2017) (per curiam) ("[T]he district court correctly found that the automobile exception applied when there was probable cause to justify the search of the vehicle."); *United States v. Shackleford,* 830 F.3d 751, 753 (8th Cir. 2016) ("Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband."); *United States v. White,* 804 F.3d 132, 138 (1st Cir. 2015) (noting police had probable cause to search vehicle, and "[u]nder these circumstances, the automobile exception and the Fourth Amendment require nothing more"); *United States v. Reaves,* 796 F.3d 738, 741 (7th Cir. 2015) ("We believe the automobile exception to the Fourth Amendment's warrant requirement is determinative."); *United States v. Alston,* 598 F. App'x 730, 734 (11th Cir. 2015) ("We affirm the denial of the motion to suppress alternatively under the automobile exception because officers had probable cause to believe that the vehicle contained evidence of criminal activity."); *United States v. Donahue,* 764 F.3d 293, 300 (3d Cir. 2014) ("The broad sweep of the automobile exception is of controlling significance in this case . . . ."). We

reach the same conclusion as the unanimous federal decisions and hold that EDMS in Iowa state courts has not undermined the validity of the automobile exception.

2. *Technological advances have not circumvented the need to take time to produce accurate warrants.* States have retained the automobile exception despite advances in technology. This spring, the Oregon Supreme Court rejected a defendant's argument that the automobile exception should be abandoned in light of technological advances that permit speedier warrants. *State v. Andersen*, 390 P.3d 992, 998 (Or. 2017). The defendant argued "warrants can now be obtained within minutes." *Id.* The *Andersen* court disagreed and, as we do today, relied on the record evidence.

> We question the premises on which defendant's argument rests. As an initial matter, the length of time that it takes to write a warrant application and obtain a warrant is a factual issue for the trial court, and not all warrants will take the same amount of time. Depending on the complexity of the circumstances that give rise to probable cause and the significance of the case, some warrants will require a longer time to prepare and obtain than others. In this case, the only evidence in the record is that it would have taken hours, not minutes, to prepare a warrant application and obtain a warrant. Officer McNair testified without contradiction that, "[j]ust [to get a warrant] for a cell phone it takes me several hours to write a search warrant, and go get that approved by a DA." The officer also explained that, if the district attorney had suggestions or corrections, it could take another hour to add those corrections to the warrant application. Not only did the trial court implicitly credit the officer's testimony, but defendant identifies no contrary evidence in the record.

*Id.* at 998–99 (alterations in original). The *Andersen* court retained the automobile exception and affirmed the warrantless search. *Id.* at 1000. That court left open the possibility that in future cases technological advances could undermine the automobile exception for all cases or

obviate its application in an individual case. *Id.* at 999. We exercise the same restraint today.

The *Andersen* court also noted the need for accuracy in search warrant applications requires time to prepare them.

> Beyond that, defendant's argument appears to assume that the only impediment to obtaining a warrant quickly is the time that it takes to transmit a completed warrant application to a magistrate and have the magistrate review and act on the application. While technology has made it easier to prepare and transmit completed applications, the testimony in this case illustrates what our cases have recognized. An officer must prepare the warrant application before submitting it to a magistrate for approval, and the process of preparing a warrant application can sometimes entail a substantial amount of time. Affidavits submitted in support of a warrant are subject to technical requirements that are intended to protect citizens' privacy. . . .
>
> Ultimately, not only must search warrant applications be sufficient to satisfy issuing magistrates, but they also must withstand scrutiny in later motions to suppress if evidence discovered while executing the warrant leads to a criminal prosecution. As in this case, district attorneys may review warrant applications drafted by officers who may be experienced in criminal matters but untrained in the law. Without that review, warrant applications might fail to comply with the technical specifications our cases have required. Those human efforts can sometimes entail substantial expenditures of time despite technological advances.

*Id.* We too require accuracy in search warrant applications. As Justice Appel has emphasized,

> The issuing of a search warrant—which, among other things, may authorize a home invasion by authorities—is among the most delicate and sensitive legal process known under our constitutional system. The process of issuing a valid search warrant is not a bureaucratic bother in which a lackadaisical, close-enough attitude toward legal requirements is good enough. Because of the gravity of the individual rights at stake and the central role of the search warrant process in protecting citizens from unwarranted intrusions by government, our review of the warrant process must be highly detailed and demanding.

*State v. Angel*, 893 N.W.2d 904, 912–13 (Iowa 2017) (Appel, J., dissenting). While electronic filing may save time, the officer still must take care to prepare the warrant application accurately whether he or she is in a patrol car at the scene of the stop or at a desk at the station house.

At this point, forcing an officer to draft a search warrant application while multitasking on the side of the road may jeopardize the accuracy of the warrant application and would require motorists to be detained for much longer periods. On the civil liberties side of the ledger, we perceive no meaningful net benefit to motorists being subjected to longer seizures. Our court has indeed expressed a preference for warrants. *State v. Breuer*, 808 N.W.2d 195, 200 (Iowa 2012). But the purposes for requiring warrants are not furthered here. For example, the particularity requirement limits the scope of the search to "cabin police power" so police do not search places and things not described in the warrant. *Id.* (quoting *State v. Ochoa*, 792 N.W.2d 260, 273 (Iowa 2010)). That rationale does not apply when the search by definition is confined to a specific vehicle. A warrant requirement also imposes the "deliberate, impartial judgment of a judicial officer . . . between the citizen and the police." *Id.* at 201 (alteration in original) (quoting *United States v. Grubbs*, 547 U.S. 90, 99, 126 S. Ct. 1494, 1501 (2006)). Yet under the automobile exception, police still must have probable cause to search the vehicle. When probable cause is absent, evidence is rightfully suppressed. *See State v. Tompkins*, 423 N.W.2d 823, 832 (Wis. 1988) ("The exclusionary rule continues to protect against unreasonable searches of an automobile; evidence obtained will not be admissible in prosecutions unless the officer had probable cause to believe the vehicle contained contraband or evidence of a committed crime."). Requiring a

warrant for an automobile search thus does little to protect privacy or advance civil liberty.

3. *New technology may pose unusual difficulties for officers on the side of the road.* While improving technology someday may allow for a different analysis of the automobile exception, we have no doubt that it will also pose its own difficulties for officers in roadside stops. For example, new technology allows for quicker communication between coconspirators. As the Connecticut Supreme Court noted,

> [W]hen officers are forced to delay their search until a warrant is procured, while the vehicle remains accessible to the public and is potentially mobile, the possibility remains that someone—possibly someone other than the defendant— will attempt either to remove the vehicle or to interfere with law enforcement efforts to maintain a secure crime scene.

*State v. Winfrey*, 24 A.3d 1218, 1226 (Conn. 2011). Indeed, here, Storm called two compatriots to the scene, so Deputy Leonard was outnumbered three to one. While they caused him no trouble, the next officer on the roadside may not be so fortunate.

**E. The Automobile Exception's Bright-Line Rule Is Preferable to an Ad Hoc Exigency Analysis for Time-Sensitive Police Interactions with Motorists.** The automobile exception is easy to apply, unlike its alternative—an amorphous, multifactor exigent-circumstances test. We generally "prefer the clarity of bright-line rules in time-sensitive interactions between citizens and law enforcement." *State v. Hellstern,* 856 N.W.2d 355, 364 (Iowa 2014). Bright-line rules are "especially beneficial" when officers "have to make . . . quick decisions as to what the law requires where the stakes are high, involving public safety on one side of the ledger and individual rights on the other." *Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 601 (Iowa 2011). The ad hoc exigency approach is the antithesis of a bright-line rule.

That which constitutes "exigent circumstances" is frequently "in the eye of the beholder," often requiring an on-the-scene judgment call by a police officer, often under stressful circumstances. Months later, in hindsight, it might not so appear to a judge far removed in time and place from the point of decision. "Exigent circumstances," far from being a "bright line," is often a difficult conclusion about which reasonable minds may differ.

*Tompkins*, 423 N.W.2d at 833 (Ceci, J., concurring). Abandoning the automobile exception would lead to many more contested suppression hearings with inconsistent and unpredictable results.

Automobile searches are conducted on the side of the road where ad hoc judgments have critical ramifications.

In a decision that is often instantaneous, the officer must [choose] either to conduct the search and risk having the evidence suppressed at trial, immobilize the vehicle until a search warrant can be obtained, or let the suspect leave without searching the vehicle and risk the evidence being released into the community. The later choice can be a critical one if that evidence involves a large quantity of illegal narcotics or a firearm.

Elizabeth Fischer, *Confusion and Inconsistencies Surrounding the Exigency Component for Warrantless Vehicle Searches Under Article I, Section 8*, 2 Duq. Crim. L.J. 123, 138 (2011) (footnote omitted). Bright-line rules support predictability of result and avoid inconsistent police and judicial determinations. *See id.* at 139 (comparing two factually similar Pennsylvania cases with different outcomes).

"It is asking too much of law enforcement officers, who are responding to fast-moving and [fast]-evolving events, to process the type of complex and speculative information contained in [the exigent-circumstances] formula and expect uniform and consistent decision-making." *Pena-Flores*, 965 A.2d at 139. We agree.

**IV. Disposition.**

For these reasons, we elect to retain the automobile exception at the present time. We therefore affirm the district court's ruling denying Storm's motion to suppress and affirm his judgment of conviction.

**DISTRICT COURT JUDGMENT AFFIRMED.**

Cady, C.J., Mansfield, and Zager, JJ., join this opinion. Cady, C.J., files a concurring opinion. Hecht, J., files a dissenting opinion joined by Wiggins and Appel, JJ. Appel, J., files a separate dissenting opinion joined by Wiggins, J.

**CADY, Chief Justice (concurring specially).**

I concur in the opinion of the court but write separately to express my commitment to the views I expressed in *State v. Gaskins*, 866 N.W.2d 1, 17 (Iowa 2015) (Cady, C.J., concurring specially). Specifically, I repeat,

> An automatic exception to the warrant requirement, particularly one based on exigency, must account for the new world of technology, and must not continue to exist simply because it existed in the past. In some instances, this new world may require movement from an automatic exigency to the standard exigent-circumstances requirement in which the rapid nature of occurrences precluding the wait for a warrant must be explained on a case-by-case basis.

*Id.* Today, on this record, I agree with the court that Christopher George Storm has not met his burden of proving that technological advances have made the automobile exception obsolete. Thus, this new world we live in does not yet require we move to a case-by-case exigency standard for automobile searches.

Nearly 100 years ago, the government succeeded in establishing an exception to the warrant requirement to deal with automobiles. *See Carroll v. United States*, 267 U.S. 132, 149, 45 S. Ct. 280, 283–84 (1925). The Court found the government met its burden of establishing the exception. *See id.*; *see also United States v. Jeffers*, 342 U.S. 48, 51, 72 S. Ct. 93, 95 (1951) ("Only . . . in 'exceptional circumstances,' may an exemption [from the warrant requirement] lie, and then the burden is on those seeking the exemption to show the need for it." (citations omitted) (quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S. Ct. 367, 369 (1948))). Eventually, we adopted the doctrine under our state constitution. *See State v. Olsen*, 293 N.W.2d 216, 220 (Iowa 1980). In effect, the state proved we could assume exigent circumstances existed

in this specific context because of "the inherent mobility of the vehicle, the fact [the] defendant [would be] alerted, and the chance that the car's contents might not be found again if a warrant had to be then obtained." *Id.* For us to reject this rationale now, we must be convinced it is no longer correct. Because automobiles are inherently mobile and a person subjected to a traffic stop will always be alerted, it is the third finding that is being eroded by technological advances that make it easier to obtain a warrant and thus remove the risk of evidence being lost. On this record, Storm has not presented compelling evidence showing it is no longer reasonable to assume an exigency exists when an officer has probable cause to believe an automobile stopped on a street or highway contains contraband or evidence of a crime.

While I remain convinced the automobile exception has a limited lifespan, its longevity will depend on the ability and pace of this state in integrating and using technological advances in a way that renders a categorical rule unreasonable.

For these reasons, I concur.

**HECHT, Justice (dissenting).**

Because I would abandon the automobile exception as a categorical exception to the warrant requirement under the Iowa Constitution and conclude on this record that the State failed to prove exigent circumstances justified a warrantless search of Christopher Storm's car, I respectfully dissent.

**I.  The Parties' Positions.**

On appeal, Storm challenges the constitutionality of the automobile exception to article I, section 8 of the Iowa Constitution.  He contends the mobility of a vehicle is no longer a per se exigency justifying a categorical exception to the warrant requirement for automobiles because officers using widely available communications technology can lawfully obtain a warrant without leaving the scene of a stop.  He also asserts the warrantless search of his vehicle based upon probable cause violated article I, section 8 of the Iowa Constitution because no exigency justified the warrantless search in this case.

The State does not dispute that modern communications technology is *available* that would enable law enforcement officers to submit warrant applications from the scene of most roadside stops.  Yet, the State offers three primary reasons in support of its position that it is not *feasible* for law enforcement officers to submit warrant applications from the scene of roadside stops.  First, the State argues there is no existing legal authority for electronic warrant applications because Iowa Code section 808.3 (2015) requires warrant applications be submitted and sworn to in a magistrate's presence.[7]  Second, the State asserts

---

[7]In 2017, the legislature amended Iowa Code section 808.3 to clarify that the submission of a warrant application can be electronic and the oath or affirmation

electronic applications for warrants would take too much time and unreasonably extend the duration of traffic stops in violating the prohibition on unreasonable seizures under article I, section 8. Finally, the State asserts remote applications are not feasible because of safety concerns, the complexity of warrant applications, and training concerns. In the alternative, the State contends that even were we to permit remote warrant applications, special exigencies justified the warrantless search of Storm's vehicle.

I part ways with the majority because I believe the rationale supporting the *categorical* exception from the warrant requirement for searches of automobiles has outlived the rationale for its adoption. Because existing technology now makes it possible for law enforcement officers to submit applications and for judicial officers to issue warrants electronically, I can no longer conclude warrantless searches of automobiles are justified solely by virtue of a vehicle's mobility. On de novo review, I conclude the circumstances surrounding the warrantless search of Storm's automobile were not exigent, and I would therefore reverse and remand.

## II. Standards of Constitutional Interpretation.

When determining whether to adopt a different interpretation of a provision of the Iowa Constitution than an analogue provision of the United States Constitution, we employ an independent approach. *State v. Short*, 851 N.W.2d 474, 486–87, 492 (Iowa 2014). Within this independent approach, we generally consider factors such as the provision's text and purpose, our caselaw, authority from other jurisdictions, scholarship and changing circumstances, and practical

_____

requirement can be met through electronic means of communication. S.F. 358, 87th G.A., 1st Sess. § 4 (Iowa 2017).

effects of various interpretations. *See State v. Gaskins*, 866 N.W.2d 1, 27–35 (Iowa 2015) (Appel, J., concurring). While we often follow federal interpretations out of consideration for interests of uniformity and judicial respect, we do not allow those interests to subvert our constitutional duty to interpret the Iowa Constitution with fidelity to its letter and purpose. *See Short*, 851 N.W.2d at 487–89.

For more than ninety years, it has been the rule that we do not presumptively defer—or otherwise delegate our constitutional duties—to the Justices of the United States Supreme Court; rather, we consider whether to follow federal interpretations of the warrant requirement on a case-by-case basis, maintaining strict fidelity to our independent interpretive duties under the Iowa Constitution. *See, e.g., State ex rel. Kuble v. Bisignano*, 238 Iowa 1060, 1066, 28 N.W.2d 504, 508 (1947) ("It is true Article I, section 8, of the Iowa Constitution is identical in language with the Fourth Amendment. This fact however does not compel us to follow the construction placed on the language by the United States Supreme Court."), *abrogated on other grounds by Mapp v. Ohio*, 367 U.S. 643, 654–55, 81 S. Ct. 1684, 1691 (1961); *State v. Rollinger*, 208 Iowa 1155, 1156, 225 N.W. 841, 841 (1929) ("[W]hile the Constitution of this state is almost a verbatim copy of a similar provision of the federal Constitution, this court has thought fit to put a construction thereon which does not correspond with the interpretation of the federal Constitution by the Supreme Court of the United States."), *abrogated on other grounds by Mapp*, 367 U.S. at 654–55, 81 S. Ct. at 1691.

We have repeatedly rejected the argument that we should adopt a "lockstep" policy of judicial deference when interpreting article I, section 8 of the Iowa Constitution to the Supreme Court's interpretations of the

Fourth Amendment. *See, e.g., State v. Baldon*, 829 N.W.2d 785, 790 (Iowa 2013) ("[O]ur right under principles of federalism to stand as the final word on the Iowa Constitution is settled, long-standing, and good law."); *State v. Tonn*, 195 Iowa 94, 104–07, 191 N.W. 530, 535–36 (1923) (rejecting a lockstep approach to the interpretation of article I, section 8 of the Iowa Constitution in favor of an interpretation of the warrant requirement adopted by other states), *abrogated on other grounds by Mapp*, 367 U.S. at 654–55, 81 S. Ct. at 1691; *see also Gaskins*, 866 N.W.2d at 6–7 (majority opinion) (collecting cases); *Short*, 851 N.W.2d at 481 (collecting cases).

**A. The Warrant Requirement.** Article I, section 8 of the Iowa Constitution provides,

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8. "Evidence obtained in violation of th[is] provision[ ] is inadmissible." *State v. Carter*, 696 N.W.2d 31, 37 (Iowa 2005) (quoting *State v. Reinders*, 690 N.W.2d 78, 81 (Iowa 2004)).

Article I, section 8 of the Iowa Constitution is an independent source of legal rights and governing principles, and we jealously guard our duty to independently interpret the protections it affords, notwithstanding its similarity to the Fourth Amendment to the United States Constitution. *State v. Brooks*, 888 N.W.2d 406, 410–11 (Iowa 2016); *accord State v. Olsen*, 293 N.W.2d 216, 219–20 (Iowa 1980); *State ex rel. Kuble*, 238 Iowa at 1066, 28 N.W.2d at 508.

The framers of the Iowa Constitution believed the gradual erosion of personal rights undermines the stability of government, so they placed

article I, section 8 within a strong and clearly defined bill of rights at the beginning of the Iowa Constitution. *State v. Ochoa*, 792 N.W.2d 260, 274 (Iowa 2010) (citing 1 *The Debates of the Constitutional Convention of the State of Iowa* 100–01 (W. Blair Lord rep., 1857), http://www.statelibraryofiowa.org/services/law-library/iaconst). The section limiting the power of the government to conduct seizures and searches protects individuals from government intrusion into property or protected individual rights. *Id.* at 273–75.

The first clause of article I, section 8 protects individuals' legitimate expectations of privacy and interests in property, security, and mobility. *See id.* at 268, 284–85; *see also Short*, 851 N.W.2d at 504. The reasonableness of a seizure or search depends on the particular facts of a case. *State v. Naujoks*, 637 N.W.2d 101, 107 (Iowa 2001). A warrantless search is per se unreasonable unless the state proves by a preponderance of the evidence that the search falls within one of a few specifically established and carefully drawn exceptions to the warrant requirement. *Id.* at 107–08; *see also Baldon*, 829 N.W.2d at 791.

The second clause of article I, section 8 requires government officials obtaining a warrant from an independent officer of the court to make a showing of probable cause that is supported by oath or affirmation. *Ochoa*, 792 N.W.2d at 268–69, 285. This requirement protects individuals from the risks of government error, bias, arbitrary action, corruption, and abuse, prioritizing accuracy in law enforcement over expediency. *See id.* at 274; *see also Brooks*, 888 N.W.2d at 418 (Appel, J., dissenting); *Baldon*, 829 N.W.2d at 829 (Appel, J., specially concurring).

The exceptions to the warrant requirement include the exigent-circumstances exception, which permits a warrantless search with

probable cause if "exigent circumstances require that the search be conducted immediately." *Carter*, 696 N.W.2d at 37. We have applied this exception to the warrantless search of automobiles, concluding that a readily mobile vehicle poses a per se exigency justifying a warrantless search upon probable cause because the vehicle or its contents may disappear if an officer leaves the scene of a traffic stop to obtain a warrant. *State v. Maddox*, 670 N.W.2d 168, 171 (Iowa 2003).

**B.  The Automobile Exception.**  We adopted the automobile exception to article I, section 8 as a rule of exigency under the Iowa Constitution in *Olsen*, 293 N.W.2d at 220. In adopting the exception, we followed precedents emanating from federal courts holding that the inherent mobility of a vehicle is an exigency justifying the automobile exception to the Fourth Amendment to the United States Constitution.[8] *See id.* (concluding federal exigency requirement is met if the vehicle is mobile, its occupants alerted, and its contents at risk of disappearing if a warrant must be obtained).

1.  *Federal origins of the automobile exception.*  The automobile exception to the Fourth Amendment began as a judicial response to practical law enforcement problems created by the National Prohibition Act's ban on the transportation of intoxicating liquors. *See Carroll v. United States*, 267 U.S. 132, 143–44, 151, 153–54, 45 S. Ct. 280, 281–82, 284, 285–86 (1925) (permitting an exception to the warrant

---

[8]The evolution of the automobile exception to the Fourth Amendment to the United States Constitution is reviewed at length in *State v. Allensworth*, 748 N.W.2d 789, 792–95 (Iowa 2008). Contrary to the majority's assertion, *Allensworth* did not reject an Iowa constitutional challenge to the warrantless search of a vehicle but limited its analysis to the automobile exception to the Fourth Amendment after concluding no state claim had been raised or decided in the district court. *See id.* at 791 n.2. I discuss the relevant portions of the federal exception's history below in my discussion of the impact of modern communications technology on justifications underlying the automobile exception to article I, section 8.

requirement because "goods in course of transportation and concealed in a movable vessel . . . readily could be put out of reach of a search warrant"). In *Carroll,* the Supreme Court held that a warrantless search of an automobile for intoxicating liquors based upon probable cause does not violate the Fourth Amendment "where it is not practicable to secure a warrant." *Id.* at 153, 45 S. Ct. at 285. The Court concluded it was not practicable to secure a warrant for the search of a vehicle at a traffic stop "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Id.* Because a vehicle's mobility posed the risk that it could be moved outside the jurisdiction while an officer left to secure a search warrant, the Court approved the warrantless search based on exigency. *Id.* at 162, 45 S. Ct. at 288.

Importantly, the Supreme Court emphasized in *Carroll* that if securing a warrant is "reasonably practicable," it must still be obtained. *Id.* at 156, 45 S. Ct. at 286; *cf. Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968) ("We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure . . . .").

In subsequent cases, the Supreme Court expanded the contours of the automobile exception recognized in *Carroll.* The Court concluded in *Husty v. United States* that a warrantless search of an automobile by a prohibition officer was not unreasonable under the Fourth Amendment even if the officer had sufficient time—after acquiring probable cause but before conducting the subsequent stop and search of the defendant's car—to procure a search warrant. 282 U.S. 694, 701, 51 S. Ct. 240, 242 (1931). The Supreme Court held in *Chambers v. Maroney* that the location of the automobile at the time of the search did not matter as

long as exigency and probable cause were both obtained at the scene of the stop; thus, a warrant was not required to search a vehicle on probable cause after the vehicle had been relocated from the roadside to the stationhouse.[9]  399 U.S. 42, 52, 90 S. Ct. 1975, 1981 (1970).  In either location—at the scene of the stop or at the stationhouse—the Court determined the risk that evidence would disappear *before an officer returned with a search warrant* supplied exigency and made it impracticable to require law enforcement officers to procure a search warrant.  *See id.* at 52, 90 S. Ct. at 1982 ("The probable-cause factor still obtained at the station house and so did the mobility of the car . . . ."); *Husty*, 282 U.S. at 701, 51 S. Ct. at 242 ("In such circumstances, we do not think the officers should be required to speculate upon the c[h]ances of successfully carrying out the search, after the delay and withdrawal from the scene of one or more officers which would have been necessary to procure a warrant.").

In a series of cases decided after *Chambers*, the Supreme Court has continued to view the mobility of automobiles as a justification for the automobile exception to the warrant requirement under the Fourth Amendment.  In *California v. Carney,* the Court concluded that a vehicle's "ready mobility" alone presents a per se exigency.  471 U.S. 386, 394, 105 S. Ct. 2066, 2070–71 (1985); *see also Maryland v. Dyson*, 527 U.S. 465, 467, 119 S. Ct. 2013, 2014 (1999) (per curiam) ("[T]he 'automobile exception' has no separate exigency requirement.").  The

---

[9]The Court has since indicated the scope of this rule may be limited.  *See United States v. Johns*, 469 U.S. 478, 487, 105 S. Ct. 881, 887 (1985) ("We do not suggest that police officers may indefinitely retain possession of a vehicle and its contents before they complete a vehicle search."); *Coolidge v. New Hampshire*, 403 U.S. 443, 523, 91 S. Ct. 2022, 2066 (1971) (White, J., concurring in part and dissenting in part) (concluding a warrantless stationhouse search is only valid if performed with "some expedition").

Court also construed "ready mobility" broadly to include vehicles capable of movement and "in a setting that objectively indicates that the vehicle is being used for transportation." *Carney*, 471 U.S. at 394, 105 S. Ct. at 2070–71 (footnote omitted). The Court augmented its "ready mobility" rationale with another rationale for the automobile exception—that individuals have a lower expectation of privacy in vehicles than homes because vehicles, unlike homes, are pervasively regulated. *Id.* at 391–94, 105 S. Ct. at 2069–71.

2. *The automobile exception in Iowa.* We first applied the automobile exception as a matter of federal law in *State v. King*, 191 N.W.2d 650, 655 (Iowa 1971). Nearly a decade later, we recognized the automobile exception under article I, section 8 of the Iowa Constitution. *See Olsen*, 293 N.W.2d at 220.

Our earliest cases applying the federal automobile exception did so within the then-existing exigent-circumstances framework. *E.g.*, *State v. Shea*, 218 N.W.2d 610, 613 (Iowa 1974) ("[A] peace officer may search an automobile without a warrant when exigent circumstances and probable cause exist."). We assessed exigency by looking at multiple factors, such as whether the car was movable, its occupants were on alert, and its contents were at risk of disappearing if officers left to secure a warrant. *See, e.g., State v. Holderness*, 301 N.W.2d 733, 737 (Iowa 1981) ("These facts, coupled with the inherent mobility of the vehicle, created a clear likelihood that the car and its contents might never have been located again *had the police departed* to obtain a warrant." (Emphasis added.)); *State v. Lam*, 391 N.W.2d 245, 249 (Iowa 1986) ("If the automobile had not been seized immediately, there was a clear likelihood that the car and its contents may never have been located again *had the police departed* to obtain a search warrant." (Emphasis added.)).

Importantly, from our earliest cases applying the automobile exception under the Fourth Amendment, we concluded a warrant was required for the search of an automobile if it was practicable to obtain one. *See, e.g.*, *State v. Schlenker*, 234 N.W.2d 142, 144–45 (Iowa 1975); *Shea*, 218 N.W.2d at 613 ("[E]xistence of exigent circumstances may relieve an officer from the obligation to obtain a warrant *if it is impracticable to do so*." (emphasis added) (quoting *State v. Jackson*, 210 N.W.2d 537, 539 (Iowa 1973))). In *State v. Schlenker*, we concluded the fact that an officer actually secured a warrant—later held invalid—to search a vehicle conclusively demonstrated that no exigent circumstances justified the search. 234 N.W.2d at 145. Implicit in this conclusion was a determination that it would have been practicable to secure a warrant authorizing the search of Schlenker's automobile.

After the Supreme Court determined that the inherent mobility of a vehicle is a per se exigency for purposes of the automobile exception in *Carney*, we abandoned our more probing exigency inquiry in cases challenging warrantless searches under both the Federal and State Constitutions. *See State v. Allensworth*, 748 N.W.2d 789, 795 (Iowa 2008) (noting the Supreme Court no longer requires a separate showing of exigency because the mobility of a vehicle is enough). In *State v. Cain*, for example, we noted that the state did not have to prove the existence of exigent circumstances supporting a warrantless search under the Fourth Amendment because vehicles are inherently mobile. 400 N.W.2d 582, 585 (Iowa 1987). Likewise, in *Maddox*, we opined that the inherent mobility of a vehicle "presents an exigent circumstance" under article I, section 8 of the Iowa Constitution. 670 N.W.2d at 171. Our perception of exigency in this context has been based on the risk that if an officer leaves the scene of a stop to secure a warrant, the vehicle or its contents

will be gone when the officer returns to perform the search. *See, e.g., Lam*, 391 N.W.2d at 249; *Holderness*, 301 N.W.2d at 737; *see also Allensworth*, 748 N.W.2d at 795 (noting the risk the vehicle will disappear is at the root of the mobility exigency under the Fourth Amendment); *Olsen*, 293 N.W.2d at 220 (noting exigency might exist for purposes of article I, section 8, if there is a risk the vehicle's contents will disappear).

**C.** **Physical Presence Requirement.** Before addressing the merits of Storm's contention that we should abandon the per se exigency rule for warrantless searches of automobiles under article I, section 8, I will address the district court's conclusion that Iowa Code section 808.3 requires an applicant for a warrant be in the physical presence of a judicial officer when applying for a warrant.

Iowa Code section 808.3 establishes "procedural requirements for issuance, execution and return" of a search warrant. *See Meier v. Sulhoff*, 360 N.W.2d 722, 726 (Iowa 1985). The statute provides,

> A person may make application for the issuance of a search warrant *by submitting before* a magistrate a *written application, supported by the person's oath or affirmation*, which includes facts, information, and circumstances tending to establish sufficient grounds for granting the application, and probable cause for believing that the grounds exist.

Iowa Code § 808.3 (emphasis added).

When interpreting a statute, we seek to determine and enforce legislative intent. *Second Injury Fund of Iowa v. Kratzer*, 778 N.W.2d 42, 46 (Iowa 2010). In determining legislative intent, we begin with the statute's text, interpreting undefined terms in accordance with their ordinary and accepted usage. *Id.* The plain meaning of a statute is conclusive unless one of the limitations or exceptions to the plain

meaning rule applies; for instance, a court may depart from a plainly worded statute if:

> [(1)] applying the language according to its plain meaning would lead to an absurd result, or there is "obvious" or "clear" evidence of contrary legislative intent; [(2)] it finds a "specific indication to the contrary;" [(3)] it finds "compelling reasons to hold otherwise;" [(4)] some other section of an act expands or restricts its meaning, or a particular provision is repugnant to an act's general purview, or other acts *in pari materia*[—]or the relevant legislative history[—]imports a different meaning; [(5)] an act's plain meaning departs from its policy, and it finds a clearly expressed legislative intention contrary to the statute's language; [or] [(6)] it finds "some other compelling reason" to disregard an act's or provision's plain meaning.

2A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction* § 46:1, at 163–68 (7th ed. 2014) (footnotes omitted).

A statute is ambiguous if it is susceptible of two or more plausible interpretations. *Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 728 (Iowa 1995). "Ambiguity may arise from specific language used in a statute or when the provision at issue is considered in the context of the entire statute or related statutes." *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 425 (Iowa 2010) (quoting *Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 425 (Iowa 2002)). If a statute is ambiguous, we consider "the statute's subject matter, the object sought to be accomplished, the purpose to be served, underlying policies, remedies provided, and the consequences of the various interpretations." *State v. McCullah*, 787 N.W.2d 90, 95 (Iowa 2010); *see also* Iowa Code § 4.6.

In deciding whether an application for a search warrant can be submitted under section 808.3, we must decide whether the phrases "submitting before a magistrate" and "supported by the person's oath or

affirmation" in section 808.3 require that an applicant for a warrant be in the physical presence of a magistrate.[10] I conclude they do not.

     1. *"Submitting before a magistrate."* I begin with the phrase "submitting before a magistrate." Iowa Code § 808.3. The words in this phrase are not defined in Iowa Code chapter 808. By its ordinary meaning, "submit" means "to present or propose to another for review, consideration, or decision" or "to deliver formally." *Submit, Merriam Webster's Collegiate Dictionary* (11th ed. 2012). The term "before" in this context can mean, alternatively, "in front of," "in the presence of," or "under the jurisdiction for consideration of." *Before, Merriam Webster's Collegiate Dictionary.* "Magistrate" is defined elsewhere in the Iowa Code to mean "a person appointed under article 6, part 4 to exercise judicial functions." *See* Iowa Code § 602.1101(8); *cf. id.* §§ 602.6401–.6405

---

[10]The parties also address whether the language of another statute should lead us to conclude Iowa Code section 808.3 requires a search warrant application be presented to a magistrate. Iowa Code section 321J.10 provides, in relevant part,

> Notwithstanding section 808.3, the issuance of a search warrant [for urine or blood tests after a fatal vehicle crash] under this section may be based upon sworn oral testimony communicated by telephone if the magistrate who is asked to issue the warrant is satisfied that the circumstances make it reasonable to dispense with a written affidavit.

Iowa Code § 321J.10(3). I would conclude this exception does not conclusively demonstrate the general assembly intended in section 808.3 to prohibit remotely administered oaths supporting search warrant applications. The exception in section 321J.10 does not focus on the oath but rather upon the form of application. It permits an oral warrant application as an express exception to the requirement in section 808.3 that warrant applications be made in writing. *See id.* (permitting "sworn oral testimony" if it is "reasonable to dispense with a written affidavit"). The focus on the form of the application is evident in the comprehensive procedural requirements of section 321J.10(3), which preserve the safeguards of a written application by requiring the applicant prepare a duplicate warrant and read it to the magistrate, the magistrate to keep a written record of the call, and the clerk of court to maintain the original and duplicate warrants along with the written record of the call. *See id.* § 321J.10(3)(*a*)–(*h*). If section 321J.10(3) focused on securing the protections provided by a physical presence requirement, its procedural protections would instead require things like a verification of identity and a reminder of the consequences of perjured testimony "to enhance the conscience of the person taking the oath." *See City of Cedar Rapids v. Atsinger*, 617 N.W.2d 272, 276 n.2 (Iowa 2000).

(describing appointment, qualifications, and powers of a magistrate). Magistrates have jurisdiction of search warrant proceedings. *See id.* § 602.6405.

I conclude the phrase "submitting before a magistrate" is ambiguous because it is capable of more than one interpretation. Under the State's preferred interpretation, the statute requires an applicant for a warrant be physically present with a magistrate. Under the interpretation preferred by Storm, the statute requires written applications to be presented for decision "under the jurisdiction or consideration of" the magistrate.[11] I find both interpretations to be plausible; hence, I conclude the statute is ambiguous.

Because section 808.3 is ambiguous, I resort to our tools of statutory construction. When interpreting an ambiguous statute, we consider the consequences of various interpretations. *State v. Hoyman,* 863 N.W.2d 1, 14 (Iowa 2015); *see also* Iowa Code § 4.6(5). The phrase at issue here concerns the method of delivering a written application to a judicial officer for a decision. The Iowa Court Rules permit written applications and other filings to be electronically submitted in court proceedings. *See* Iowa Ct. Rs. 16.201, 16.307(2). I perceive no reasonable purpose for requiring personal physical delivery of a written application for a search warrant.

"[W]e interpret statutes when possible to avoid untoward results." *Hoyman,* 863 N.W.2d at 13. If we interpret the phrase to require applicants to be physically present with the magistrate when submitting

---

[11]The State contends that the interpretation advanced by Storm should be rejected because the term "before" is surplusage if "submit" means "to present or propose to another for review, consideration, or decision." I disagree. In this context, the term "before" adds the jurisdictional component to the phrase "submitting before," which indicates that the magistrate must be acting within the judicial officer's lawful authority.

applications for search warrants, we will impose an unnecessary procedural barrier and discourage their use. Resolving the ambiguity in favor of defendants who are the subject of a search and law enforcement officers who have an interest in efficiently applying for warrants, I would conclude the phrase "submitting before a magistrate" in section 808.3 does not require an applicant be in the physical presence when making an application for a search warrant.

2. *"Supported by the person's oath or affirmation."* I next consider whether Iowa Code section 808.3 requires an applicant for a search warrant be in the physical presence of a magistrate when making an oath or affirmation in support of an application for a search warrant. The text of section 808.3 requires that every warrant application be "supported by the person's oath or affirmation." Iowa Code § 808.3. The oath or affirmation requirement is in a wholly separate phrase from the requirement of a signed writing and separated by a comma. Even if physical presence is not required for the *submission* of a written application, it might still be required for the swearing of an oath or affirmation.

Turning to the plain language of the statute, the word "oath" is commonly defined as "[a] solemn declaration, accompanied by a swearing to God or a revered person or thing, that one's statement is true or that one will be bound to a promise[.]" *Oath, Black's Law Dictionary* (10th ed. 2014). An "affirmation" is considered "[a] solemn pledge equivalent to an oath but without reference to a supreme being or to swearing." *Affirmation, Black's Law Dictionary.* Statements made under oath or affirmation constitute sworn testimony, subjecting the affiant to the penalty of perjury for false statements. *See City of Cedar Rapids v. Atsinger,* 617 N.W.2d 272, 276 (Iowa 2000).

Section 808.3 is silent on whether *physical* presence of the affiant before a magistrate is required. At common law, oaths and affirmations were administered in person. *See United States v. Turner*, 558 F.2d 46, 50 (2d Cir. 1977). However, the modern trend recognizes that oaths and affirmations can be remotely administered. *See, e.g., id.* ("Long Distance has truly become . . . 'the next best thing to being there.' The Fourth Amendment is sufficiently flexible to account for such technological advances."); *State v. Gutierrez-Perez*, 337 P.3d 205, 210–11 (Utah 2014) (concluding language in an e-Warrant application met the Fourth Amendment's oath or affirmation requirement); *Smith v. State*, 311 P.3d 132, 140 (Wyo. 2013) (concluding a telephonic oath provides protections for a defendant equal to those provided by an in-person oath). Given the difference between the common law approach and the modern understanding, I conclude the phrase in section 808.3 requiring a warrant application be "supported by the person's oath or affirmation" is ambiguous. Accordingly, I resort to our rules of statutory construction in resolving the ambiguity.

Generally, "we interpret statutes consistent with the common law unless the statutory language clearly negates the common law." *State v. Carter*, 618 N.W.2d 374, 377 (Iowa 2000). As recognized above, oaths and affirmations at common law were administered in person. *See Turner*, 558 F.2d at 50. However, I find no basis for concluding the common law *required* physical presence—physical presence for the administration of an oath or affirmation was the *only option* in a world where remote audio and video communications technologies did not exist. In the late eighteenth century,

> the main requirements for a valid affirmation were that the affiant (1) knowingly and intentionally make a statement to a neutral and detached magistrate; (2) affirm, swear, or declare

that the information in the statement is true and correct; and (3) do so under circumstances that impress upon the affiant the "solemnity and importance of his or her words and of the promise to be truthful, in moral, religious, or legal terms."

*Gutierrez-Perez*, 337 P.3d at 210 (quoting *United States v. Bueno-Vargas*, 383 F.3d 1104, 1110 (9th Cir. 2004)). Notably, physical presence was not among these requirements. *Id.* at 210–11 (concluding physical presence was not required to satisfy these requirements). Thus, the common law rule does not resolve the ambiguity.

We do not interpret statutes in isolation but "strive to achieve harmony and consistency" between provisions. *Carter*, 618 N.W.2d at 377. In *Carter*, we held that an oath or affirmation must occur "in the presence of an authorized official" *in order to support a conviction for perjury* under Iowa Code section 720.2. *Id.* This was, in part, because the physical presence of an official was deemed necessary to bind a person's conscience. *Id.* at 376–77. Because physical presence is required to support perjury convictions under the Iowa Code, I would likewise interpret section 808.3 to require a form of presence sufficient to maintain a criminal consequence for a warrant applicant violating the legal obligation to tell the truth. *See Atsinger*, 617 N.W.2d at 276 (finding presence of another is required for valid oath in perjury context).

My analysis does not stop there, however. I believe the meaning of text remains sufficiently flexible to allow the legal system to embrace new technologies. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 86–87 (2012); *see also, e.g., United States v. Jones*, 565 U.S. 400, 400–05, 132 S. Ct. 945, 949 (2012) (recognizing a GPS tracking device can effect a "search" within the Fourth Amendment); *Kyllo v. United States*, 533 U.S. 27, 40, 121 S. Ct. 2038, 2046 (2001) (recognizing a "search" within the Fourth Amendment can be undertaken

through thermal imaging); *State v. Pashal*, 300 N.W.2d 115, 117–19 (Iowa 1980) (interpreting the warrant application process to permit tape-recorded testimony in support of probable cause determination). It might be tantamount to physical presence for purposes of section 808.3 for a warrant applicant to be present before a magistrate through two-way video communication. In making this assessment, we should consider the purposes underlying the oath-or-affirmation requirement and explore whether technological presence can adequately serve those purposes.

The requirement of an oath or affirmation exists to impress on an affiant the importance of telling the truth and to ensure the affiant recognizes the legal obligation to tell the truth. *See Atsinger*, 617 N.W.2d at 276 & n.2. The presence of a court officer serves "to enhance the conscience of the person taking the oath" and "to assure that the person who had knowledge of the facts is the same person who subscribed to the verification." *Id.* at 276 n.2. The oath or affirmation and the interconnection between the affiant and the court officer are calculated to increase the reliability of information asserted in a warrant application.

I conclude the use of two-way video technology is tantamount to physical presence for purposes of the administration of an oath or affirmation.[12] Two-way video systems such as Skype™ and FaceTime™ enable people located at different places "to see and hear one another simultaneously." *State v. Rogerson*, 855 N.W.2d 495, 500 (Iowa 2014).

---

[12]My interpretation of the oath and affirmation requirement of Iowa Code section 808.3 is supported by a recent amendment to the statute. Without altering the existing statutory requirements that warrant applications be in writing, submitted before a magistrate, and supported by oath or affirmation, the legislature clarified that the submission can be electronic and the oath or affirmation requirement can be met through electronic means of communication. *See* S.F. 358, 87th G.A., 1st Sess. § 4 (Iowa 2017).

Although virtual presence is not identical to physical presence, *see id.* at 509 (Hecht, J., concurring specially), it does not significantly diminish the protections provided by an oath or affirmation made in the physical presence of a magistrate for purposes of the warrant requirement. A magistrate administering a video oath or affirmation can see the affiant in assessing credibility and connect the affiant with a warrant application. The audio and video connection between a magistrate and an affiant can, in my view, adequately impress upon the affiant the legal obligation to tell the truth and underscore the solemnity of the oath. *See Astinger*, 617 N.W.2d at 276 & n.2. Because two-way video technology provides access to auditory and visual information for both the magistrate and the affiant, I conclude it is tantamount to physical presence for purposes of the administration of oaths and affirmations under section 808.3.

While adequately serving the purposes of physical presence, video technology dramatically enhances the efficiency of the warrant application process. We should not avert our eyes from the technological changes that are all around us and cling to old ways of doing things fashioned long before the communications revolution began. The users of our justice system reasonably expect it will incorporate the technologies they are using in their daily lives. Indeed, I would embrace existing technologies enabling law enforcement officers to seek, and allowing judicial officers to issue, search warrants before conducting automobile searches when possible and reasonably practicable, thereby enhancing the protection of privacy afforded by article I, section 8. *See Smith*, 311 P.3d at 140 ("[T]he availability of such a procedure increases the likelihood that a search warrant will be obtained in DWUI arrest

situations, and it greatly decreases the amount of time necessary to obtain the warrant.").

**D.    Technology and the Mobility Exigency.**    I now turn to Storm's assertion that the mobility of an automobile no longer poses a per se exigency justifying a *categorical* automobile exception under article I, section 8 because modern communications technologies enable warrant applications to be remotely prepared and submitted without leaving the scene of a traffic stop.  *See Gaskins*, 866 N.W.2d at 17 (Cady, C.J., concurring specially) ("An automatic exception to the warrant requirement, particularly one based on exigency, must account for the new world of technology, and must not continue to exist simply because it existed in the past.").

As I have already noted, the Supreme Court emphasized in *Carroll* that a warrant must be obtained if it is "reasonably practicable" to do so and noted that "where the securing of a warrant is reasonably practicable, it must be used."  *See Carroll*, 267 U.S. at 156, 45 S. Ct. at 286; *see also Terry*, 392 U.S. at 20, 88 S. Ct. at 1879 ("We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure . . . .").  Our own early automobile exception jurisprudence did the same.  *See, e.g., Shea*, 218 N.W.2d at 613 ("[E]xistence of exigent circumstances may relieve an officer from the obligation to obtain a warrant if it is impracticable to do so." (quoting *Jackson*, 210 N.W.2d at 539)); *Schlenker*, 234 N.W.2d at 145.

Among the foundational principles undergirding the automobile exception are the concepts of mobility and "reasonable practicability."  In determining it was not reasonably practicable for the law enforcement officer to obtain a warrant in *Husty,* the Supreme Court expressly cited

the risk that any evidence within the vehicle would have been lost during "the delay and withdrawal from the scene of one or more officers which would have been necessary to procure a warrant." 282 U.S. at 701, 51 S. Ct. at 242. Indeed, the Court implicitly determined in *Chambers* that the mobility of the suspect's vehicle renders a search warrant impracticable even if there had been time to obtain one prior to the search. *See* 399 U.S. at 52, 90 S. Ct. at 1982.

As Chief Justice Cady recently presaged, however, the need for an automatic exigency rule "may be affected by the changing technology that is speeding up the warrant process." *Gaskins*, 866 N.W.2d at 17. Technological advances now make it reasonably practicable to apply for a warrant from the scene of a traffic stop, at least in some circumstances. Law enforcement officers equipped with laptops and smart phones can and do access the internet from their patrol cars.[13] Using laptops or smartphones, law enforcement officers can establish an audiovisual connection with a magistrate for remote administration of the oath or affirmation. These technologies are widely available and accessible to most officers. Where it is reasonably practicable to use such technologies in applying for search warrants during traffic stops, we should require their use.

I do not contend here that the automobile exception should be categorically abandoned. The exception should be maintained for circumstances in which the State establishes exigency other than the mobility of the automobile rendered an application for a search warrant impracticable. For example, if an officer's lack of internet access

---

[13]Indeed, Deputy Leonard confirmed that he had internet access from the roadside where he stopped Storm. Although he characterized the access as "slow," the State failed to establish it was so poor as to support a finding that communication with either the prosecutor or a magistrate was impractical.

precludes the submission of an application for a warrant from the scene of a stop for a reason outside of the State's control, it would not be reasonably practicable to secure a warrant from the scene of the stop.[14] If securing a warrant is not "reasonably practicable" under the circumstances, then the officer can search a readily mobile vehicle based upon probable cause and exigent circumstances.

The State contends, and the majority affirms, that the categorical automobile exception can be justified and should be maintained because individuals hold lower expectations of privacy in motor vehicles. I disagree. Professor LaFave has observed that "[m]ost Americans view the automobile as more than merely a means of transportation." 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.2(b), at 735 (5th ed. 2012) (quoting Lewis R. Katz, *Automobile Searches and Diminished Expectations in the Warrant Clause*, 19 Am. Crim. L. Rev. 557, 570–72 (1982)). In his concurring opinion in *State v. Gaskins*, Justice Appel aptly described how people use their automobiles.

> Automobiles are used as temporary homes or even a place to take a snooze after a long (or not so long) drive. Bank statements, recent mail, credit card invoices, love notes, and medical information may be stored in automobiles. Glove compartments and consoles are pretty good places to keep

---

[14]The State contends circumstances other than potential shortcomings of technology support a categorical automobile exception to the warrant requirement. For example, an officer's concentration on the task of preparing an application for a warrant could be disrupted by the need to manage the conduct of multiple people present at the scene of the stop. The State also suggests that some warrant applications are complex and their preparation at the scene of the stop would unreasonably extend the duration of the stop. I view these factors as part of the circumstances upon which any claim of actual exigency should be made. Unlike my colleagues in the majority, I have confidence in our law enforcement officers' ability to assess the circumstances at the scene of a traffic stop and decide whether an exigency other than mere mobility of the automobile renders an electronic application for a warrant impracticable. Prior to the Supreme Court's determination in *Carney* that the inherent mobility of a vehicle is a per se exigency for purposes of the automobile exception, we required a similarly probing exigency inquiry to be made for warrantless vehicle searches under both the Federal and State Constitutions. *See Allensworth*, 748 N.W.2d at 795.

> "papers and effects." Professionals driving home from work take bundles of documents with them in both hard and electronic formats that are often placed on the back seat. . . . Today, with new electronic devices and wireless networks, it is not unusual for an automobile to serve as a virtual office for the conduct of private business.

866 N.W.2d at 36 (Appel, J., concurring specially). I conclude Justice Appel's characterization of the contemporary uses commonly made of automobiles is apt. I therefore strongly disagree with the notion that the reasonable expectation of privacy in one's car is so diminished as to support the categorical exception to the warrant requirement reaffirmed today by the majority.

We measure privacy interests by gauging the subject's "exposure to public view, the types of activities that take place there, the steps taken to protect it from public view, and a host of other variables." Christopher Slobogin, *The World Without a Fourth Amendment*, 39 UCLA L. Rev. 1, 22 (1991) [hereinafter Slobogin] (footnotes omitted). Storm had a constitutionally protected privacy interest in his vehicle. This is evident from the fact that even under the rubric of the automobile exception, we have protected motorists' article I, section 8 rights by enforcing the requirement to show probable cause and ready mobility. *See id.* (noting without an expectation of privacy, probable cause would not be required either). Storm took steps to protect his vehicle's contents from public view by placing them in the vehicle's middle console, which indicates he expected privacy. Although I would concede his automobile is less private than his residence, "the minor privacy infringement to enforce traffic laws does not itself justify the further intrusiveness of criminal investigations." Sarah A. Seo, Essay, *The New Public*, 125 Yale L.J. 1616, 1670 (2016).

The majority concludes alternatively that the categorical automobile exception should be maintained because of compelling societal interests in efficiency, public safety, and officer safety. I concede the argument that the automobile exception is easy for law enforcement officers to apply. Because no search warrant is required under the categorical exception, officers do not have to bother with warrants before searching automobiles. From the perspective of law enforcement officers, the exception is quite efficient to be sure. But the primary purpose of the warrant clause was clearly not to make investigations of crime easy or efficient. *See State v. Tibbles*, 236 P.3d 885, 889 (Wash. 2010) (en banc) ("[W]hatever relative convenience to law enforcement may obtain from forgoing the burden of seeking a warrant once probable cause to search arises . . . , we adhere to the view that 'mere convenience is simply not enough.'" (quoting *State v. Patterson*, 774 P.2d 10, 12 (Wash. 1989))). A quotation of Justice Robert Jackson is apt here. He once observed that "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent." *Johnson v. United States*, 333 U.S. 10, 14, 68 S. Ct. 367, 369 (1948). Thus, although the categorical automobile exception obviously promotes efficiency for law enforcement officers wishing to search automobiles in furtherance of the investigation of crimes, it comes with far too great of a privacy cost. The exception obliterates the warrant requirement and motorists' right of privacy in their vehicles. Although this cost might formerly have been deemed acceptable because of the impossibility of obtaining a warrant from the scene of a stop, I now conclude it is one this court should no longer require Iowans to pay. The ease and efficiency of a criminal investigation

are not constitutionally protected interests and must yield to the constitutional requirement for a warrant.

The interests in public and officer safety, however, warrant special consideration. All traffic stops executed by law enforcement officers along the roadway are attended by a risk of injury to motorists and law enforcement officers. The State has deemed the level of risk low enough to perform *warrantless* roadside vehicle searches under the most recent iteration of the automobile exception. It is clear the State has deemed this risk to be acceptable because warrantless searches along the open roadway have been routine since *Carroll* was decided. Yet the majority would now conclude a warrant application—performed *inside* a secured police car—is too dangerous to justify extending a stop. Certainly, when the duration of a traffic stop is extended, the risk to motorists and law enforcement officers will, to some unknown extent, be enhanced. I acknowledge this may be true if a warrant must be sought and obtained prior to conducting a valid automobile search. But I am not convinced by the majority's assertion that the magnitude of the enhanced risk resulting from electronic applications for search warrants made possible by advancing technology is so great as to justify continued recognition of a *categorical* exception to the warrant requirement for automobile searches.

I conclude the categorical exception permitting a warrantless search of a vehicle under article I, section 8 can no longer be sustained under the theory that a vehicle's mobility poses a per se exigency. Accordingly, I would hold that a warrantless search of a vehicle must be justified by exigent circumstances other than mobility. *See, e.g., Lam*, 391 N.W.2d at 249; *Holderness*, 301 N.W.2d at 736–37; *Shea*, 218 N.W.2d at 613.

**E. Duration of a Seizure Required to Obtain a Warrant.** The majority asserts that we should not abandon the automobile exception as a categorical rule under article I, section 8 because it no more violates article I, section 8 to search a vehicle without a warrant than it does to seize a person without a warrant long enough to obtain a warrant to search. I acknowledge the dissonance between these interests, but conclude that the automobile exception should still be abandoned as a categorical rule.

Article I, section 8 of the Iowa Constitution protects the right of individuals to be free from "unreasonable seizures and searches." Iowa Const. art. I, § 8. "A search and seizure without a valid warrant is per se unreasonable unless it comes within a recognized exception such as consent, search incident to arrest, probable cause and exigent circumstances, or plain view." *State v. Pickett*, 573 N.W.2d 245, 247 (Iowa 1997) (quoting *State v. Manna*, 534 N.W.2d 642, 644 (Iowa 1995)).

The majority accepts the State's argument that if we strike down the automobile exception and require remote warrant applications when it is reasonable under the circumstances to obtain a warrant, then we will be protecting individuals from a warrantless *search* by subjecting them to a lengthier warrantless *seizure*. In *Chambers*, the Supreme Court adverted to this conflict between competing constitutional interests.

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

399 U.S. at 51–52, 90 S. Ct. at 1981. By permitting an unreasonable *search* in order to protect a suspect from what would be a reasonable

*seizure*, the majority has given primacy to the mobility interests protected by article I, section 8 and concluded as a matter of law that the property, privacy, and security interests protected by the same provision are less worthy of protection.

I acknowledge that vehicle searches conducted during traffic stops present an inherent conflict between the interests protected by the prohibitions on unreasonable seizures and unreasonable searches. However, I conclude the deprivation resulting from a warrantless seizure of a reasonable duration pending an application for a warrant to search an automobile is a constitutionally tolerable cost for protection of the privacy rights at issue. I agree with the thoughtful comments of a scholar who has written on the conflicting interests in this context.

> Undeniably, the brief seizure of the automobile and its occupants is an intrusion upon the Fourth Amendment rights of its occupants, but the brevity of the immobilization—which often will not require more than an hour—reduces the seriousness of this intrusion. The alternative—an immediate search of the car—irreparably destroys the occupants' privacy interests in the automobile and the containers inside. There can be no serious debate as to which is the greater and which is the lesser intrusion, *Chambers* notwithstanding. The rights protected by the Fourth Amendment are more faithfully observed when only the lesser intrusion—the brief seizure—is permitted unless and until a judicial officer authorizes the greater intrusion: a search pursuant to a search warrant issued after a judicial officer concurs that there is probable cause to search.

Carol A. Chase, *Privacy Takes a Back Seat: Putting the Automobile Exception Back on Track After Several Wrong Turns*, 41 B.C. L. Rev. 71, 89 (1999) [hereinafter Chase] (footnote omitted).

Article I, section 8 protections in the automobile stop and search contexts should apply more forcefully to searches because individuals who prefer seizures to searches can only be protected by a warrant, while individuals who prefer warrantless searches to seizures can be protected

by consenting to the search.[15] *See Chambers*, 399 U.S. at 63, & n.8, 90 S. Ct. at 1987, & n.8 (Harlan, J., concurring in part and dissenting in part); *see also* Slobogin, 39 UCLA L. Rev. at 21 n.64. While a warrantless seizure invades a person's mobility interest temporarily until mobility is restored, a warrantless search invades someone's privacy permanently. Chase, 41 B.C. L. Rev. at 88–89 (predicting that as technological advances permit warrants to be remotely obtained and reduce the time required to procure a warrant, a brief seizure for the sake of getting a warrant arguably becomes an even lesser intrusion into an individual's Fourth Amendment rights than an immediate warrantless search).

Upon developing probable cause to search a vehicle, an officer wishing to search the vehicle should inform a suspect that they have a constitutional right to be free from unreasonable searches, explain that probable cause gives the officer the right to detain the suspect for a reasonable period of time necessary to secure a warrant, and advise the suspect that if they would prefer to avoid the delay attending the application for a search warrant, they may waive the right to demand a warrant and consent to the search. Upon receipt of this advisory, the suspect is given an opportunity to make an informed and voluntary choice to require a warrant be obtained or consent to a warrantless search in order to limit the duration of the seizure.

If technology permitting a remote application for a warrant to search an automobile is reasonably accessible to the officer executing the stop, it should be used. In my view, the potential unreasonableness of a seizure's duration does not, by itself or in combination with a vehicle's

---

[15]I note that when Storm asked if a warrant was required for the search of his truck, Deputy Leonard told him a warrant was not required.

mobility, justify a *categorical* exception to the warrant requirement for automobile searches under article I, section 8. Considerations affecting the time it takes to apply for a warrant—such as the time of day, the complexity of the facts supporting a finding of probable cause, and the degree of detail constitutionally required—may be addressed within a case-specific exigency analysis. *See State v. Andersen,* 390 P.3d 992, 999 (Or. 2017) (reviewing considerations affecting the time it takes to get a warrant that are relevant to a case-specific exigency determination).

In my view, the mobility of an automobile no longer provides a sound rationale for a per se exigency rule. Under the standard I would adopt, the State must show facts demonstrating an objectively reasonable basis for its claim of exigency supporting a warrantless search. *See Tibbles,* 236 P.3d at 890 ("Exigent circumstances will be found only where obtaining a warrant is not practical because the delay inherent in securing a warrant would compromise officer safety, facilitate escape, or permit the destruction of evidence.").[16]

**F. Exigent Circumstances.** With the foregoing principles in mind, I now turn to the issue of whether an exigency beyond the mobility of Storm's vehicle justified the warrantless search in this case. Because Storm does not argue that we should apply a different standard for analyzing exigency under article I, section 8 than the Supreme Court applies under the Fourth Amendment, I would apply the federal standard but reserve the right to apply it more stringently than under federal law. *See, e.g., State v. Kern,* 831 N.W.2d 149, 174 (Iowa 2013).

---

[16]We have found, for example, an exigency supporting a warrantless search exists where there is a "danger of violence and injury to the officers or others; risk of the subject's escape; or the probability that, unless taken on the spot, evidence will be concealed or destroyed." *Jackson,* 210 N.W.2d at 540.

Here, the State made several arguments in support of its contention that exigent circumstances permitted the warrantless search of Storm's vehicle under the facts of this case. The State argues that even after Storm was handcuffed and detained, his friends or accomplices could have arrived, commandeered the vehicle, and driven it away. *Cf. State v. Winfrey*, 24 A.3d 1218, 1226 & n.8 (Conn. 2011) (discussing the concern that defendant or someone else could interfere by removing the vehicle from the scene). In adopting the State's position, the majority notes that Storm used his cell phone at the scene of the stop to call a friend. Two people subsequently arrived at the scene of the stop and, with Deputy Leonard's approval, took responsibility for Storm's automobile. There is no evidence that either Storm or the two persons who came to retrieve the automobile were uncooperative or unresponsive to the deputy's commands during the stop.

The majority concludes, however, that the prevalence of cell phones makes it easier, as a general matter, for detained suspects to summon others and arrange for evidence to be destroyed during delays occasioned by warrant applications. This determination should be made on a case-specific basis. In this case, the officer perceived a low enough degree of danger to feel comfortable permitting Storm to summon his friends. Although the number of people present at the scene of the stop and the ability of law enforcement officers present there to manage the scene under the circumstances are among the circumstances considered in the exigency analysis I would adopt, *see Jackson*, 210 N.W.2d at 540, I find no substantial evidence in this record tending to prove that the arrival of Storm's friends interfered in any way with the deputy's control of the environment or his ability to prepare a warrant application if he had chosen to do so.

My colleagues in the majority also conclude a warrant requirement for the search of Storm's automobile raises grave safety concerns for arresting officers. If Deputy Leonard's attention had been divided between managing the scene of the stop and preparing a warrant application, the majority suggests, it would have been much easier for Storm's friends or associates to catch the deputy off guard. *See Winfrey*, 24 A.3d at 1226 & n.8. Although public and officer safety concerns are a factor in the exigency analysis I propose, *see Jackson*, 210 N.W.2d at 540, I find no evidence in this record tending to prove such concerns were justified during the stop that is the subject of this case. The stop occurred in the middle of the afternoon in broad daylight. No inclement weather, visibility problems, or traffic-related issues presenting safety concerns for Deputy Leonard, Storm, or other motorists are evident in this record. Deputy Leonard had no difficulties managing the scene of the stop where all persons present were obedient to the officer's direction.

Although my colleagues in the majority must acknowledge that mere inconvenience surrounding the warrant application process is not enough to establish an exception to the warrant requirement under article I, section 8, they nonetheless assert it would have been impracticable for the deputy in this case to apply for a warrant. An extension of the duration of the roadside stop for the amount of time necessary to apply for a search warrant would, they contend, have created an impracticable burden for Deputy Leonard in this case and would create a similar burden for Iowa law enforcement officers who are already stretched too thin in counties with only one or two deputies on duty at a time. My colleagues further contend Deputy Leonard lacked the training, equipment, and administrative support necessary to use

modern communications technology to expedite the warrant application process. Given these equipment and training circumstances, my colleagues contend, Deputy Leonard could not reasonably have been expected to apply for a warrant.

I am not persuaded. Under the facts of this case, I find the time it would likely have taken to apply for a warrant did not render an electronic warrant application impracticable. Deputy Leonard believed any application for a warrant must first be approved by the county attorney under a local policy; however, there is no evidence in this case that such approval would not have been readily available. Although the State's evidence suggested it would have taken Deputy Leonard at least an hour or two to prepare a warrant application in this case, I would credit the more credible testimony of Storm's expert witness on this subject.[17] Storm's expert, Bryan Barker, is a former law enforcement patrolman who became a prosecutor and trained officers on obtaining search warrants. Barker persuasively testified that it would have taken the deputy as little as fifteen minutes to prepare an uncomplicated warrant application under the circumstances of this case and a warrant could have been obtained within an hour. Barker's opinion that an application for a search warrant for routine automobile searches could have been promptly prepared is bolstered by reports from other jurisdictions: (1) in 1981 an Iowa federal court determined a telephonic warrant could be obtained in the federal system in as little as twenty minutes, *see United States v. Baker*, 520 F. Supp. 1080, 1084 (S.D. Iowa 1981); (2) in 1973 (before the advent of cell phones) the San Diego

---

[17]In this respect, this case is different than *Andersen*, 390 P.3d at 999, where the officer's contention that it would take hours to obtain a search warrant went unrebutted.

District Attorney's Office estimated ninety-five percent of telephonic warrants were obtained in fewer than forty-five minutes, *see People v. Blackwell*, 195 Cal. Rptr. 298, 302 n.2 (Ct. App. 1983) (citing Paul D. Beechen, *Oral Search Warrants: A New Standard of Warrant Availability*, 21 UCLA L. Rev. 691, 700 (1973)); (3) in 2009, an Oregon officer testified that he could obtain a telephonic search warrant in just one hour, *see State v. Machuca*, 218 P.3d 145, 153 (Or. Ct. App. 2009), *rev'd on other grounds*, 227 P.3d 729 (Or. 2010) (en banc); and (4) in 2015, the New Jersey Supreme Court cited a study of forty-two telephonic automobile search warrant applications that on average took less than one hour, *see State v. Witt*, 126 A.3d 850, 865–66 (N.J. 2015).

I acknowledge that although law enforcement officers may be equipped to submit electronic warrant applications, "improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant." *Missouri v. McNeely*, 569 U.S. 141, ___, 133 S. Ct. 1552, 1562 (2013). Nonetheless, the Supreme Court has observed that "technological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency" in OWI cases. *Id.* at ___, 133 S. Ct. at 1562–63; *see also State v. Pettijohn*, 899 N.W.2d 1, 22 (Iowa 2017).

The majority contends Deputy Leonard was not equipped to submit an electronic application for a warrant from the scene of the stop in this case. I am not persuaded. Deputy Leonard possessed a smart phone[18]

---

[18]The majority notes that the phone supplied to Deputy Leonard by his employer was an older "flip phone," not a smart phone. The standard I propose for exigency determinations would not allow the State to justify the categorical automobile exception's continuing existence by claims that law enforcement officers are not

and his patrol car was equipped with a computer. Although I credit the deputy's testimony that internet access is not available from all locations in the county, he admitted access was available to him from the scene of the stop in this case.

I also reject the majority's conclusion that Deputy Leonard was not adequately trained to make a warrant application from the scene of the stop in question. Although he had submitted fewer than ten warrant applications during his eight years of service as a law enforcement officer, the deputy testified that he had received training on the subject at the law enforcement academy. If the deputy had not been trained on the specific topic of electronic applications for warrants, this deficit was a matter that was entirely within the control of the state. We should not recognize such state-created training deficits as a matter of exigency excusing a warrant under article I, section 8.

Accordingly, I would reverse the ruling on the motion to suppress, vacate Storm's conviction, and remand for further proceedings.

Wiggins and Appel, JJ., join this dissent.

---

supplied with smart technology that is widely used by other Iowans. This court's understanding of constitutional doctrine and fidelity to the warrant requirement should not be driven by the unwillingness of appropriators to provide commonly available technology to law enforcement officers. Notwithstanding, Deputy Leonard did possess a smart phone that was available for use in establishing an internet connection at the scene of the stop if he had chosen to do so.

**APPEL, Justice (dissenting).**

I join Justice Hecht's dissent, but write separately to emphasize several points. As I noted in *Gaskins,* a federal court in Iowa has stated it takes as little as twenty minutes to obtain a telephonic search warrant. *State v. Gaskins,* 866 N.W.2d 1, 19 (Iowa 2015) (Appel, J., concurring specially); *see United States v. Baker,* 520 F. Supp. 1080, 1084 (S.D. Iowa 1981). And that was almost forty years ago. Decades-old caselaw in other jurisdictions indicate police are able to obtain warrants in as little as twelve and fifteen minutes. *See, e.g., State v. Flannigan,* 978 P.2d 127, 131 (Ariz. Ct. App. 1998) (stating a warrant can be obtained in fifteen minutes); *People v. Aguirre,* 103 Cal. Rptr. 153, 155 (Ct. App. 1972) (involving a warrant obtained to search a home in twelve minutes). Why is it that law enforcement is able to obtain warrants in twenty minutes, fifteen minutes, and twelve minutes in these cases decades ago, but it now takes much longer to obtain a warrant in Dallas County?

I also find the majority's discussion of "bright line" rules unhelpful. I have critiqued resort to the claimed need for bright-line rules as a mere slogan for results-oriented jurisprudence, and it need not be repeated here. *See Gaskins,* 866 N.W.2d at 19.

In any event, the requirement that law enforcement obtain a warrant before engaging in a search is a very bright-line rule. In fact, the constitutionally enshrined warrant requirement shines too bright for the majority, which modifies it by continuing a broad and outdated exception to the warrant requirement. No one should think this case involves a preference for bright-line rules—it involves a choice between competing bright-line approaches.

Further, the preference for bright-line rules seems to apply only when it favors the state. For example, the exigent-circumstance and community-caretaking exceptions to the warrant requirement are fact-based exceptions not based on bright-line rules. One wonders whether the majority will abandon them in favor of a "bright line." In particular, it will be interesting to see if the repeatedly stated preference for bright-line rules means the notoriously spongy and inconsistently applied multifactor test of consent in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041 (1973), will fall to the wayside under article I, section 8 of the Iowa Constitution in favor of a bright-line rule that law enforcement must specifically inform a citizen of his right to decline to a search and obtain truly knowing and voluntary consent. *See State v. Lowe,* 812 N.W.2d 554, 590–94 (2012) (Appel, J., concurring in part and dissenting in part) (noting question of whether *Schneckloth* should be abandoned was not raised and questioning wisdom of continued reliance on *Schneckloth*); *State v. Pals,* 805 N.W.2d 767, 782 (Iowa 2011) (reserving the question of whether *Schneckloth* should be abandoned under article I, section 8). Or is the preference for bright lines an unbalanced and preferential doctrine generally available to the state, but not to a person asserting constitutional protections?

In addition, our caselaw indicates that exceptions to the warrant requirement be "jealously and carefully drawn." *State v. Ochoa,* 792 N.W.2d 260, 284 (Iowa 2010) (quoting *Jones v. United States,* 357 U.S. 493, 499, 78 S. Ct. 1253, 1257 (1958)); *State v. Strong,* 493 N.W.2d 834, 836 (Iowa 1992); *State v. Sanders,* 312 N.W.2d 534, 538 (Iowa 1981), *overruled by Gaskins,* 866 N.W.2d at 16. Interested readers may make their own judgment, but nothing in the majority opinion persuades me that it seeks to ensure that exceptions to the warrant requirement are

jealously and carefully drawn. Indeed, the majority opinion turns the jealously-and-carefully-drawn formula established in existing Iowa caselaw on its head and embraces an opposite approach, namely that exceptions to the warrant requirement are to be broadly and generously construed.

In any event, the controlling opinion of the chief justice undercuts a bright-line rule to some extent. According to Chief Justice Cady, the defendant failed to meet its burden to introduce sufficient facts to defeat the automobile exception. Although not so stated, the opinion in effect employs a presumption of exigent circumstances in favor of law enforcement when law enforcement seeks to search an automobile and shifts the burden to the defendant to prove otherwise. Under the opinion of the chief justice, once law enforcement raises the automobile exception the burden shifts to the defendant to establish what was found by the Iowa federal district court in *Baker* in 1981, namely, that law enforcement authorities are capable of obtaining a search warrant in short order. *See* 520 F. Supp. at 1084.

I do not agree that the burden of proof on what the state is capable of doing should rest with the defendant. Aside from constitutional considerations, the burden of proof ordinarily rests on the party in the best position to produce the evidence. But in any case, the chief justice's approach allows a defendant to make a fact-based showing that the presumption of exigency under the automobile exception cannot be invoked to support a search.

If narrowly construed, this fact-based approach could run the risk of results that vary from county to county and could provide a distinct disincentive for law enforcement to adopt current feasible technology. I am sure, however, the chief justice does not intend to embrace a rule

with such perverse incentives. Indeed, I read the chief justice's opinion as promoting adoption of feasible technology with all deliberate speed. In order to avoid perverse incentives under the framework established by the chief justice, a defendant must be able to meet his or her newly established burden to overcome the presumption of exigency in the case of an automobile search by showing the *availability* of feasible technology to obtain a warrant with dispatch. The opinion of the chief justice does not indicate what kind of evidence the defendant must produce, but apparently the defendant must make a better and more detailed record than was developed in this case.

Wiggins, J., joins this dissent.